ESTATE OF ELIZABETH CHRISTIAN, DECEASED, LINDA A. STEELE AND CATHERINE J. RODINO, CO-EXECUTRIXES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Christian v. Commissioner
Docket Nos. 7369-76; 7370-76; 7371-76; 7372-76; 7373-76; 7374-76; 7375-76; 11092-76; 11093-76; 3740-77; 3892-77
United States Tax Court
T.C. Memo 1989-413; 1989 Tax Ct. Memo LEXIS 411; 57 T.C.M. (CCH) 1231; T.C.M. (RIA) 89413; August 10, 1989
Joe C. Emerson and Theodore J. Esping, for the petitioners. Brett James Miller, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes, and also determined that petitioners are liable as transferees, as follows: Docket
Taxable
Deficiency/
Petitioner(s)
No.
Year
Liability
Elizabeth Christian [2]
7369-76
12/31/73
$   1,415
Estate of F. Thomas
7370-76
2/28/73 $   9,686
Christian, Deceased,
Linda A. Steele and
Catherine J. Rodino,
Co-Executrixes and
June L. Christian,
Transferees of F. & C.
Enterprises, Inc.
Estate of F. Thomas
7371-76
12/31/73
$  67,628
Christian, Deceased,
Linda A. Steele, and
Catherine Rodino,
Co-Executrixes and
June L. Christian
Estate of F. Thomas
7372-76
2/28/73 $  12,710
Christian, Deceased,
Linda A. Steele and
Catherine Rodino,
Co-Executrixes and
June L. Christian,
Transferees of L. & J.
Corporation
Harry Fein and
7373-76
12/31/73
$ 108,303
Lillian Fein
Harry Fein and
7374-76
2/28/73 $  12,710
Lillian Fein
Transferees of
L. & J. Corporation
Harry Fein and
7375-76
2/28/73 $   9,686
Lillian Fein
Transferees of
F. & C. Enterprises
Harry Fein,
11092-76
2/28/73 $   9,686
Transferee of
F. & C. Enterprises
Estate of F. Thomas
11093-76
2/28/73 $  12,710
Christian, Deceased,
Linda A. Steele and
Catherine Rodin,
Co-Executrixes,
Transferees of F. & C.
Enterprises
Harry Fein,
3740-77
2/28/73 $  12,710
Transferee of
L. & J. Corporation
Estate of F. Thomas
3892-77
2/28/73 $   9,686
Christian, Deceased,
Linda A. Steele and
Catherine Rodino,
Co-Executrixes,
Transferee of L. & J.
Corporation
*412 After concessions, [3] the sole issue for decision is whether the exchange of stock of corporations owned by Harry Fein, Fred Thomas Christian, and Elizabeth Christian (hereinafter collectively referred to as "petitioners") for stock of McDonald's Corporation ("McDonald's") qualifies as a tax-free reorganization under section 368. *413 FINDINGS OF FACT Some of the facts of this case have been stipulated and are found accordingly. The stipulation of facts, first supplemental stipulation of facts, second supplemental stipulation of facts, and exhibits are incorporated herein by this reference. On the date of filing her petition in this case, Elizabeth Christian, whose estate is a petitioner in these consolidated cases, resided in Elkhart, Indiana. Elizabeth Christian filed a U.S. Individual Income Tax Return, Form 1040, for the calendar year 1973, with the Internal Revenue Service Center at Memphis, Tennessee. Elizabeth Christian was the mother of Fred Thomas Christian. On the date of filing their petitions in their respective cases, Fred Thomas Christian, whose estate is a petitioner in these consolidated cases, and June L. Christian, respectively, resided in South Bend, Indiana and Elkhart, Indiana. Fred Christian and June Christian filed a joint U.S. Individual Income Tax Return, Form 1040, for the calendar year 1973 with the Internal Revenue Service Center at Memphis, Tennessee. On the date of filing their petitions in their respective cases, Harry Fein and Lillian Fein resided in South Bend, Indiana. *414 Harry Fein and Lillian Fein filed a joint U.S. Individual Income Tax Return, Form 1040, for the calendar year 1973 with the Internal Revenue Service Center at Memphis, Tennessee. In the late 1950's, Harry Fein ("Fein") and Fred Christian ("Christian") separately opened McDonald's restaurants in northern Indiana under franchise agreements with McDonald's. Fein's first restaurant was located in Mishawaka, Indiana, and Christian's was located in Elkhart, Indiana. McDonald's, based in Oak Brook, Illinois, is a franchisor and owner of fast food restaurants located throughout the United States and in many foreign countries. In the early 1960's, Fein and Christian combined their businesses and operations. Throughout the 1960's and early 1970's, the combined Fein and Christian businesses prospered and expanded. As of late 1972, the Fein and Christian businesses included nine franchised McDonald's restaurants in northern Indiana and southern Michigan. Eight of the restaurants were located in the South Bend metropolitan area; one was located in Niles, Michigan. Fein and Christian owned and operated their McDonald's restaurants through three closely-held corporations (the "Fein-Christian *415 Companies"). Those corporations were F. and C. Enterprises, Inc., L. and J. Corporation, and Fein and Christian Enterprises, Inc. The Fein-Christian Companies each held stock in subsidiary companies, each of which in turn controlled and operated franchised McDonald's restaurants. Fein and Christian each owned 500 shares of stock in F. and C. Enterprises, Inc. and L. and J. Corporation. Fein, Christian, and Elizabeth Christian respectively owned 500 shares, 375 shares and 125 shares of stock in Fein and Christian Enterprise, Inc. Elizabeth Christian had no active involvement in the operations or management of the Fein-Christian Companies. The relationship between McDonald's and the principals of the Fein-Christian Companies was at all times positive. Gerald Newman ("Newman"), who was McDonald's Vice-President and Controller and who had significant responsibility for franchisee restaurant acquisitions, had a high regard for Christian. In the late 1960's and early 1970's, McDonald's pursued a program of acquiring McDonald's restaurants from its franchisees. Some of the acquisitions were for cash, but others were for McDonald's common stock. [4]McDonald's completed numerous such *416 restaurant acquisitions during that period. In the latter part of 1972, executives of McDonald's and the principals of the Fein-Christian Companies began discussions about the potential acquisition by McDonald's of the Fein-Christian Companies. By letter dated December 1, 1972, McDonald's formally offered to acquire the Fein-Christian Companies. The proffered purchase price was payable in unregistered shares of McDonald's common stock and equalled: A. $ 3,500,000 B. Plus (i) Cash, (ii) Leasehold security deposits, (iii) Inventory, (iv) Receivables, and (v) Real Estate at appraisal value, C. Less the total liabilities of the Fein-Christian Companies and liabilities related to the other assets being acquired. The offer provided that "You will be required to furnish investment representations with regard to your acquisition of said stock, and all stock certificates will bear appropriate restrictive legends." Fein and Christian were also offered the right to participate by way of "piggyback" rights in such public offerings as McDonald's might conduct during *417 a negotiated period of time. The amount of stock subject to such sale was also to be negotiated. McDonald's offering letter further noted that "The transaction must be treated as a pooling of interests for McDonald's and may be structured either as a taxable or tax free exchange for you." On December 1 and 20, 1972, petitioners' representatives Frederick Baer ("Baer"), an attorney, and Daniel Chiddister, a certified public accountant, met with representatives of McDonald's to discuss the proposed acquisition. McDonald's representatives at one or both of these meetings included Paul Duncan ("Duncan"), an attorney in McDonald's legal department, and Newman. The negotiations focused on price and other negotiable terms of the acquisition and on the preparation of the necessary voluminous documentation. Baer, an experienced attorney whose practice was concentrated in corporate and business matters, was the principal representative of the Fein-Christian Companies in the negotiations and documentation preparation. Fein and Christian had complete confidence in Baer and relied upon him for negotiating all but the most basic terms and conditions of the merger. Fein and Christian themselves *418 had little involvement in the negotiations. The representatives of the Fein-Christian Companies and McDonald's reached agreement as to price following a meeting held December 22, 1972. Baer had sought a purchase price of $ 4,620,000. The finally agreed-to purchase price, payable in shares of unregistered, restricted McDonald's common stock, was $ 4,012,000 plus an amount equal to the following items as set forth in the audited combined balance sheet of the Fein-Christian Companies as of January 31, 1973: A. All leasehold security deposits, B. Inventory of food and paper, C. Cash on hand and on deposit in banks, D. Accounts receivable, and E. Interpolated cash surrender value of life insurance policies, F. Minus total liabilities of the Fein-Christian Companies as set forth in the closing balance sheet. In mid- to late February of 1973, the parties to the merger executed an Agreement and Plan of Merger, an Agreement of Merger, and other related documents. With the execution of the Agreement of Merger on February 28, 1973, the three Fein-Christian Companies were merged into McDonald's effective February 28, 1973. McDonald's utilized the "pooling of interests" *419 method to account for the business combination in its acquisition of the Fein-Christian Companies. As part of the merger, petitioners agreed to a covenant not to compete as embodied in section 8.1 of the Agreement and Plan of Merger. This three-year covenant, commencing on February 28, 1973, prevented each petitioner from acting as an "owner, partner, shareholder * * *, broker, dealer, agent, employee (except as an employee or licensee of McDonald's or one of its affiliated companies), consultant or otherwise" with respect to a "McDonald's type restaurant business" located within a 25-mile radius of any of the Fein-Christian restaurants acquired by McDonald's. The possibility of Christian's being employed by McDonald's was also discussed at a time prior to the merger's February closing. Christian, however, took no job with McDonald's after the merger's completion. Petitioners were issued 62,706 shares of unregistered common stock in McDonald's. In acquiring the McDonald's stock, petitioners "jointly and severally represent[ed] to McDonald's that they [were] taking the McDonald's Stock for their own accounts for investment and without a view to the distribution thereof." *420 Under an Allocation Schedule of Stock attached as an exhibit to the Agreement and Plan of Merger, 59,579 shares of McDonald's stock were divided among Fein, Christian and Elizabeth Christian as follows: No. of Shares of
McDonald Stock to
No. of Shares of
be Delivered, Less
McDonald's Stock to
Stockholders
Escrow
be Held in Escrow
Total
Harry Fein
26,811
2,979
29,790
F. Thomas Christian
24,810
2,979
27,789
Elizabeth Christian
2,000
-0-
2,000
At no time during the negotiations leading to the execution of the Agreement and Plan of Merger did McDonald's offer or did the Fein-Christian Companies request that the consideration for the merger include cash. McDonald's, in its offer to acquire the Fein-Christian Companies, was indifferent as to whether the Fein-Christian Companies treated the transaction as tax-free, and McDonald's so represented to the principals and representatives of the Fein-Christian Companies. McDonald's did insist, however, that the transaction conform with the appropriate accounting principles and SEC restrictions applicable to treating the business combination as a "pooling of interests." In fact, had the business *421 combination not qualified as a "pooling of interests," McDonald's would have "[made] no deal." The appropriate accounting principles included, but were not limited to, Accounting Principle Board Opinion No. 16 ("APB No. 16") and Accounting Series Release Nos. 130 and 135 ("ASR Nos. 130 & 135"). In compliance with APB No. 16, McDonald's was precluded from treating the proposed acquisition as a "pooling of interests" if it offered cash as a part of the consideration for the acquisition. Moreover, Newman advised Baer that McDonald's accountants were of the opinion that the acquisition must not only include the Fein-Christian Companies, but, in accord with APB No. 16, must include every parcel of real estate leased or used in connection with the Fein-Christian business activities. Consequently, McDonald's received, as part of the acquisition of the Fein-Christian Companies, certain improved and unimproved real estate located in St. Joseph and Elkhart Counties, Indiana, in exchange for unregistered shares of its common stock. The transfer of the real estate was made pursuant to an Agreement For Conveyance of Real Estate, dated February 28, 1973. Christian and Fein respectively received *422 1,564 and 1,563 shares of McDonald's common stock in exchange for the real estate. These 3,127 shares of McDonald's stock were the remaining shares of the total 62,706 shares issued to petitioners in the merger. ASR Nos. 130 and 135 require that there be 30 days of combined earnings after the "pooling of interests" before acquired corporations' earnings can be reported in an acquiror's quarterly earnings. For McDonald's to have reported the earnings of the Fein-Christian Companies in its earnings for the March 31st quarter of 1973, the acquisition had to be completed by February 28, 1973. Closing by this February date was important to McDonald's; "It was a very important part of [McDonald's] showing * * * increased earnings [for the] first quarter [of] '73." In the negotiations Baer insisted that the transaction be structured as a tax-free reorganization. He additionally sought other advantages for his clients. The initial offer tendered by McDonald's on December 1, 1972, did not provide petitioners with any type of required or guaranteed registration rights. The only registration rights originally proffered petitioners were incidental rights, or the chance to participate *423 by way of "piggyback" rights in such public offerings as McDonald's might conduct during a negotiated period of time. In negotiating with McDonald's representatives, Baer had discussed with Newman the history of McDonald's secondary stock offerings and had been advised that McDonald's generally had at least one registration annually. McDonald's had such registrations in June of 1970, 1971, and 1972. In the course of negotiation, however, McDonald's had not guaranteed that a secondary registration would take place in 1973 or 1974. As a corporate attorney, Baer often represented the owners of privately held businesses in these businesses' sales to publicly held companies. In one such sale, Baer had watched as the stock that one of his clients had received in a merger in which the client did not receive required registration rights plummeted in value from $ 52 to $ 5 per share prior to the time the client was able to sell the stock. To prevent this from happening to petitioners, Baer sought guaranteed registration rights in his negotiations with McDonald's. In negotiating for the mandatory registration rights in December of 1972, Baer described the rights to McDonald's representatives *424 as a "must" for the acquisition's completion. Moreover, he suggested to McDonald's representatives that the rights were "most material [,] that we would have to have the right to call upon [McDonald's] for a free registration if [McDonald's] did not have a registration in 1973 and 1974 since [petitioners] would most likely like to dispose of up to 50% of [their McDonald's] stock during the first two years [, and] that [petitioners] would most likely like to sell 25% of [their] stock [at the end of June of 1973]." In making these representations to McDonald's negotiators, Baer had not previously spoken with petitioners concerning petitioners' desire to sell their soon-to-be-acquired McDonald's shares. Further, petitioners had not told Baer that the merger's completion hinged on their attaining the required registration rights. The negotiating parties finally agreed to limited, required registration rights running in petitioners' favor. Specifically, the Agreement and Plan of Merger permitted petitioners to compel McDonald's to conduct, at its own expense, [5] a secondary public offering in which petitioners could sell all or some of their McDonald's shares *425 if McDonald's had not conducted an offering by April 1, 1974, and if petitioners had not been permitted to sell at least 20,000 shares in that prior offering. In securing these required registration rights for petitioners, Baer acted solely on his own; none of the petitioners had instructed Baer to pursue additional registration rights from McDonald's beyond the "piggyback" rights originally offered. As part of the negotiating process, Baer insisted that the Agreement and Plan of Merger be modified to provide that the acquisition be terminated if a listing application for the McDonald's shares was not approved by the New York Stock Exchange ("NYSE"). Common stock in McDonald's was, at all times pertinent hereto, listed and traded on the NYSE. For McDonald's stock, a listing of the shares on the NYSE was an absolute requirement before the shares could be issued and delivered. Listing was thus a matter of concern whether or not an individual stockholder intended to retain or sell his shares. Duncan rejected Baer's listing request but suggested that petitioners instead accept indemnification rights should *426 the stock not be listed and petitioners suffer damages. As finally agreed and made a part of the Agreement and Plan of Merger, petitioners accepted the indemnification rights. The Agreement and Plan of Merger provided that 90 percent of the total McDonald's shares petitioners acquired in the merger were to be registered in petitioners' names in accordance with an allocation schedule attached to the agreement as Exhibit A. These shares were to be delivered to petitioners in exchange for petitioners' stock in the Fein-Christian Companies. The remaining ten percent of the McDonald's shares were to be registered in the names of petitioners according to the allocation schedule but were to be retained by McDonald's in escrow. In a letter dated February 16, 1973, Baer further requested that petitioners be provided the opportunity to withdraw pledged shares from the escrow account and replace such shares with other security or securities of similar value. McDonald's agreed to this modification. Due to the date of the request, however, the negotiating parties typed the request at the bottom of the Agreement and Plan of Merger. Baer negotiated as he did in order to achieve maximum *427 flexibility for petitioners with respect to the stock they were to receive in the merger. His actions as their attorney do not support the inference that petitioners had a preconceived intention or commitment to sell the stock they were to receive. Baer concluded prior to the merger that the transaction constituted a reorganization within the meaning of section 368 and so advised his clients. Baer's legal analysis included consideration of the "continuity of interest" requirement applicable to reorganizations under section 368(a)(1)(A). In that connection Baer questioned his clients concerning their intentions regarding the stock they would receive in the merger. Baer's contemporaneous notes of one such conversation in February of 1973 indicate that "no consideration" was being given to the sale of the stock, that "Harry [Fein] said he will keep stock," [6] and that "Tom [Christian] said he'll 'never' sell." Baer did not request a ruling from the Internal Revenue Service as to the tax status of the acquisition because the ruling process was lengthy, McDonald's wanted to get the transaction closed as soon as possible, and Baer did not foresee any tax problems in the structure *428 of the transaction. On April 11, 1973, McDonald's by letter notified petitioners that it was planning a registered secondary stock offering in which petitioners were eligible to participate. The registration was to take place in late June of 1973. McDonald's needed to conduct its secondary offering prior to June 30th so that it could use its old financials and avoid the expense of new financials, which required an expenditure of somewhere between $ 150,000 and $ 200,000. The April 11th letter also informed petitioners that the planned registration discharged McDonald's from any further obligation to provide petitioners with their required registration rights. It was this aspect of the required registration rights which made the rights limited. Fein and Christian discussed *429 the April 11, 1973, letter with each other and with Baer, who explained its legal implications. Fein also discussed the letter with his wife, Lillian. The discussion with Lillian, who was not experienced in business matters, centered upon Fein's health. Fein had previously undergone major surgery for cancer, and his prognosis as of April of 1973 was hopeful but uncertain. After receipt of the letter and the discussions referred to above, petitioners decided to sell their McDonald's shares in the secondary stock offering planned by McDonald's. Baer notified McDonald's of petitioners' intent in letters dated April 20, 1973. Baer informed McDonald's that the number of shares to be sold by petitioners represented all the shares petitioners had received in the acquisition. He specifically addressed paragraph 7.2 of the Agreement and Plan of Merger which dealt with the escrow of stock and indicated that petitioners desired to sell these additional shares held in escrow and were prepared to provide the appropriate substitute collateral. Before petitioners could sell their McDonald's shares, the shares needed to be listed with the NYSE. On April 25, 1973, McDonald's filed with the *430 NYSE a listing application which included the 62,706 shares of common stock petitioners acquired in the merger of the Fein-Christian Companies into McDonald's. Duncan informed Baer by a letter dated May 10, 1973, that on May 9, 1973, the NYSE approved the listing application. Petitioners were to receive their shares of McDonald's common stock by the end of the week of May 14, 1973. On June 25, 1973, the proposed secondary registration, which was to include the shares of petitioners along with those of other former franchisees, was withdrawn by McDonald's on the advice of the corporation's investment bankers who suggested that unfavorable market conditions existed. McDonald's stock had been dropping in value at the time of the registration's withdrawal. [7] Petitioners did not withdraw from the proposed June registration before McDonald's investment bankers' advice. On August 29, 1973, McDonald's notified petitioners that the secondary offering was to be reactivitated. *431 On September 13, 1973, Christian made a charitable contribution of 4,000 shares of his McDonald's common stock to the Mennonite Foundation, Inc. ("Mennonite Foundation"). In determining the amount of his 1973 charitable contribution to the Mennonite Foundation, Christian valued each McDonald's share on September 13, 1973, at $ 68 5/16. Christian's donation to the Mennonite Foundation amounted to $ 273,250. Christian claimed a charitable contribution for his 1973 donation of McDonald's stock in the amount of $ 224,560. On September 19, 1973, Fein made a charitable contribution of 4,500 shares of his McDonald's common stock to the Jewish Community Foundation of the Jewish Federation - Council of Greater Los Angeles ("Jewish Community Foundation"). In determining the amount of this 1973 charitable contribution, Fein valued each share of McDonald's common stock on September 19, 1973, at $ 68 5/16. Fein's donation to the Jewish Community Foundation amounted to $ 307,406. Fein claimed a charitable contribution for his 1973 donation of McDonald's stock in the amount of $ 300,767. On October 3, 1973, pursuant to the reactivated secondary registration, under which petitioners exercised *432 their incidental rights under paragraph 6.4 of the Agreement and Plan of Merger, the following blocks of shares were sold: Harry Fein
26,853 shares
F. Thomas Christian
25,353 shares
Elizabeth Christian
2,000 shares
Mennonite Foundation
4,000 shares
Jewish Community Foundation
4,500 shares
Total
62,706 shares
On their 1973 income tax return, Fein and Christian reported their gains on the sale of the stock sold in the offering, but did not report as income any gain based upon their receipt of the McDonald's shares which they contributed to charities prior to the offering. On March 14, 1973, Christian incorporated T.C. Enterprises, Inc. with the Secretary of State of Indiana. The purpose of the corporation was to engage in the construction business. On July 19, 1973, Christian incorporated Kings Palace, Inc. with the Secretary of State of Indiana. The purpose of the business was to deal in the sale of apparel and allied merchandise. On October 4, 1973, Christian incorporated Christian's, Inc. with the Secretary of State of Indiana. The purpose of the corporation was to engage in and conduct a system of restaurants. Christian was the sole incorporator *433 of T.C. Enterprises, Inc., and of Christian's, Inc.
OPINION The issue for decision in this case is whether the exchange of stock owned by petitioners for stock in McDonald's qualifies as a reorganization under section 368. We observe that the transaction constituted a statutory merger that was in form eligible for reorganization treatment under section 368(a)(1)(A). However, respondent determined that such exchange of stock did not qualify as a reorganization because petitioners failed to maintain a sufficient equity interest in McDonald's after the exchange. Petitioners bear the burden of proving respondent's determination to be erroneous. Rule 142(a). It is well settled that, in addition to meeting specific statutory requirements, a reorganization under section 368(a)(1)(A) must also satisfy the continuity of interest doctrine. See sec. 1.368-1(b), Income Tax Regs. The continuity of interest doctrine has developed from the fundamental principle of tax law that the substance of a transaction, and not its form, controls its tax consequences. Penrod v. Commissioner, 88 T.C. 1415, 1427 (1987). See also Redding v. Commissioner, 630 F.2d 1169, 1175 (7th Cir. 1980), *434 revg. on other grounds 71 T.C. 597 (1979); Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); Gregory v. Helvering, 293 U.S. 465, 469-470 (1935). Because the reorganization provisions are based on the premise that the shareholders of an acquired corporation have not terminated their economic investment, but have merely altered its form, the continuity of interest doctrine limits the favorable nonrecognition treatment enjoyed by reorganizations to those situations in which (1) the nature of the consideration received by the acquired corporation or its shareholders confers a proprietary stake in the ongoing enterprise, and (2) the proprietary interest received is definite and material and represents a substantial part of the value of the property transferred. See generally Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179 (1942); LeTulle v. Scofield, 308 U.S. 415 (1940); John A. Nelson Co. v. Helvering, 296 U.S. 374 (1935); Helvering v. Minnesota Tea Co., 296 U.S. 378 (1935); Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462 (1933); *435 see also sec. 1.368-2(a), Income Tax Regs.; B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.01, at 14-4 (4th ed. 1979). The requirement that the shareholders of the acquired corporation receive a proprietary interest in the continuing enterprise is satisfied if such shareholders receive preferred or common stock of the acquiring corporation pursuant to the acquisition. See, e.g., John A. Nelson Co. v. Helvering, supra; Helvering v. Minnesota Tea Co., supra.
The entire consideration received by petitioners pursuant to the February 28, 1973, merger consisted of McDonald's common stock. Thus, in form, the nature and amount of such consideration satisfied the continuity of interest test. However, the parties to this litigation do not agree on the effect of petitioners' subsequent actions. Respondent argues that the acquisition and the subsequent sale of McDonald's stock by petitioners was part of an overall plan to "cash out" their investment and, therefore, that the two events should be considered to be in substance one transaction. The consequence of his position would be to treat petitioners *436 as having received all cash on the date of the acquisition, and, therefore, the acquisition would fail the continuity of interest test. On the other hand, petitioners argue that their decision to sell all their McDonald's stock was based only upon events which occurred after the acquisition and that the acquisition and subsequent sale should therefore be treated as separate transactions. The resolution of this issue turns on the application of the step transaction doctrine. The step transaction doctrine is, in effect, another rule of substance over form; it treats a series of formally separate "steps" as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result. See B. Bittker & J. Eustice, supra, at 14-131; Mintz & Plumb, "Step Transactions in Corporate Reorganizations," 12 Inst. on Fed. Tax. 247-248 (1954). There is no universally accepted test as to when and how the step transaction doctrine should be applied to a given set of facts. Courts have applied three alternative tests in deciding whether to invoke the step transaction doctrine in a particular situation. The narrowest alternative is the "binding commitment" *437 test, under which a series of transactions are collapsed if, at the time the first step is commenced, there is a binding commitment to undertake the later step. See Commissioner v. Gordon, 391 U.S. 83, 96 (1968); see also United States v. Adkins-Phelps, Inc., 400 F.2d 737 (8th Cir. 1968); Ward v. Commissioner, 29 B.T.A. 1251 (1934). The binding commitment test has the advantage of promoting certainty in the tax planning of shareholders. Under such test, a court must make an objective determination as to whether the acquired shareholders were bound by an obligation to sell the shares received in an acquisition. Other factors, such as intent by such shareholders to sell their shares, are not considered. However, there have been objections to this test on the ground that the result is easily manipulable by taxpayers. As this Court has observed, "the step transaction doctrine would be a dead letter if restricted to situations where the parties were bound to take certain steps. (Emphasis in original.)" Penrod v. Commissioner, 88 T.C. at 1429, quoting King Enterprises, Inc. v. United States, 418 F.2d 511, 518 (Ct. Cl. 1969). *438 (Fn. ref. omitted.) At the other extreme, the most far-reaching alternative is the "end result" test. Under this test, the step transaction doctrine will be invoked if it appears that a series of formally separate steps are really prearranged parts of a single transaction intended from the outset to reach the ultimate result. See King Enterprises, Inc. v. United States, 418 F.2d at 516; see also Helvering v. Alabama Asphaltic Limestone Co., supra; Morgan Manufacturing Co. v. Commissioner , 124 F.2d 602 (4th Cir. 1941), affg. 44 B.T.A. 691 (1941); Heintz v. Commissioner, 25 T.C. 132 (1955); Ericsson Screw Machine Products Co. v. Commissioner, 14 T.C. 757 (1950). The end result test is based upon the actual intent of the parties as of the time of the merger. Penrod v. Commissioner, 88 T.C. at 1430. It can be argued that any test which requires a court to make a factual determination as to a party's intent promotes uncertainty and therefore impedes effective tax planning. However, in contrast to the binding commitment test, the end result test is flexible and bases *439 tax consequences on the real substance of the transactions, not on the formalisms chosen by the participants. The third test is the "interdependence" test, which focuses on whether "the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." Redding v. Commissioner, 630 F.2d at 1177; see also Kass v. Commissioner, 60 T.C. 218 (1973), affd. without published opinion 491 F.2d 749 (3d Cir. 1974); Farr v. Commissioner, 24 T.C. 350 (1955); American Wire Fabrics Corp. v. Commissioner, 16 T.C. 607 (1951); American Bantam Car Co. v. Commissioner, 11 T.C. 397 (1948), affd. 177 F.2d 513 (3d Cir. 1949). This test concentrates on the relationship between the steps, rather than on their "end result." See Security Industrial Insurance Co. v. United States, 702 F.2d 1234, 1245 (5th Cir. 1983). However, since the interdependence test requires a court to find whether the individual steps had independent significance or whether they had meaning only as part of the larger transaction, the *440 court may be called upon to determine the result the participants hoped to achieve. This calling necessitates our examining the parties' intent and noting the time element involved. American Bantam Car Co. v. Commissioner, 11 T.C. at 405. The interdependence test is, thus, a variation of the end result test. Penrod v. Commissioner, 88 T.C. at 1430. In McDonald's of Zion v. Commissioner, 76 T.C. 972 (1981), revd. sub nom. McDonald's Restaurants of Illinois v. Commissioner, 688 F.2d 520 (7th Cir. 1982), and Penrod v. Commissioner, supra, this Court has considered the step transaction doctrine in connection with acquisitions by McDonald's of a number of franchised restaurants in statutory mergers similar in form to the transaction in the present case. In the first, McDonald's of Zion, a group of individuals led by Messrs. Garb and Stern ("the Garb-Stern group") owned and operated McDonald's restaurants under franchise agreements with McDonald's. In 1968, McDonald's began negotiating to acquire such restaurants. However, the negotiations soon broke down, as a major problem arose concerning *441 the form of payment. The Garb-Stern group wished to sell its stock only for cash. McDonald's, however, wanted to acquire the group's holdings in exchange for stock, so that it could treat the acquisition as a "pooling of interests" for financial accounting purposes. In March of 1973, the parties to those negotiations reached an agreement, whereby McDonald's agreed to acquire the Garb-Stern companies in exchange for McDonald's unregistered common stock and to allow the Garb-Stern group to include such stock in a proposed June of 1973 registration. Under this plan, McDonald's could account for the acquisition in accordance with the "pooling of interests" method, and the Garb-Stern group could promptly obtain cash for its investment. The Garb-Stern companies were merged into McDonald's on April 1, 1973, and the Garb-Stern shareholders received shares of McDonald's unregistered common stock. However, because of a weak market for its shares, McDonald's postponed the planned June of 1973 registration. After the price of its stock recovered, McDonald's completed a similar registration and sale on October 3, 1973, [8] and the Garb-Stern shareholders registered and sold virtually all their *442 McDonald's stock received in the merger. McDonald's treated the merger as a purchase for tax purposes and claimed a cost basis for the assets acquired from the Garb-Stern group. The Commissioner determined that the acquisition was a reorganization under section 368(a)(1)(A) and that, therefore, McDonald's was only entitled to a carryover basis for the Garb-Stern assets. This Court first found that the facts "when viewed in a realistic and objective manner, portray the direct and unwavering intent of the Garb-Stern group to sell virtually all of the McDonald's stock they received pursuant to the merger." McDonald's of Zion v. Commissioner, 76 T.C. at 990. This Court also found that "the two transactions were independent. The merger transaction did not require or commit the Garb-Stern group to sell their McDonald's stock." McDonald's of Zion v. Commissioner, 76 T.C. at 998. (Fn. ref. omitted.) Consequently, this Court held that there was no binding commitment by the Garb-Stern group to sell their stock when it *443 was acquired, that the steps were not mutually interdependent, that the step transaction doctrine was not applicable, that the Garb-Stern group did intend to continue to hold a proprietary interest in McDonald's, and that the acquisition constituted a reorganization within the meaning of section 368(a)(1)(A). The Seventh Circuit reversed, holding that the merger and subsequent sale should have been stepped together. McDonald's Restaurants of Illinois v. Commissioner, 688 F.2d 520, 524 (7th Cir. 1982), revg. McDonald's of Zion v. Commissioner, 76 T.C. 972 (1981). The circuit court first applied the "end result test" and pointed to "the history of the parties' relationships, the abortive attempt to buy some of the group's holdings, the final comprehensive deal, and the Garb-Stern group's determination to sell out even in the face of falling prices in the stock" as indicative that "there can be little doubt that all the steps were taken to cash out the Garb-Stern group." McDonald's Restaurants of Illinois v. Commissioner, 688 F.2d at 524. (Fn. ref. omitted.) Next that court applied that "interdependence test," observing that: *444 This is the test [the interdependence test] the Tax Court purported to apply, 76 T.C. at 997-999, although its version of the test is indistinguishable from yet another formulation, the "binding commitment" test. That is, the Tax Court would have found interdependence only if the Garb-Stern group had itself been legally bound to sell its stock. In fact, the "interdependence" test is more practical and less legalistic than that. It concentrates on the relationship between the steps, rather than on the "end result" * * *. Here it would ask whether the merger would have taken place without the guarantees of saleability, and the answer is certainly no. * * * [688 F.2d 524.]
Finally, the circuit court opined that the facts "are enough to satisfy the spirit, if not the letter, of the 'binding commitment' test." McDonald's Restaurants of Illinois v. Commissioner, 688 F.2d at 525. Having applied the last of the three step-transaction tests to the facts of the merger and stock sale before it, the circuit court concluded, "Under any of the three applicable criteria, then, the merger and subsequent sale should have been stepped together. *445 " McDonald's Restaurants of Illinois v. Commissioner, 688 F.2d at 525. Following the lead of the Seventh Circuit, the circuit to which this case is appealable, in its decision in McDonald's Restaurants of Illinois, we likewise consider the merger and subsequent stock sale before us in light of the three alternative tests of the step-transaction doctrine. Prior to doing so, [9] we initially address whether, at the time of the merger, petitioners intended to sell the McDonald's stock they were to receive. In ascertaining this intent, we must necessarily rely rather heavily on objective facts under the theory that one's actions generally reflect one's intentions. Such reliance is also warranted by the "logic of tell-tale facts" when compared to "chameleon words." King Enterprises, Inc. v. United States, 418 F.2d at 519. In our view, the weight of the evidence *446 indicates that, from the outset and at the time of the acquisition, petitioners did not intend to sell enough shares of their McDonald's stock to destroy their continued interest or proprietary stake in the ongoing enterprise. We reach this conclusion based on the cumulative effect of the following facts: First, through the course of the negotiations leading to the execution of the merger's documents, McDonald's never offered nor did the Fein-Christian Companies request that the consideration for the merger include cash. Second, the relationship between McDonald's and the principals of the Fein-Christian Companies was at all times positive. Absent is the ill will which characterized the relationship between McDonald's and the Garb-Stern group in McDonald's of Zion. McDonald's of Zion v. Commissioner, 76 T.C. at 976; see also McDonald's Restaurants of Illinois v. Commissioner, 688 F.2d at 521 and 524. Third, as noted by Baer in contemporaneous notes prepared in February of 1973, the month of the Fein-Christian Companies' merger into McDonald's, his clients gave no consideration to the possibility of selling their soon-to-be-acquired McDonald's *447 shares. Fourth, the exigencies of timing in the instant merger were dictated by McDonald's wants. McDonald's needed the merger completed by February 28, 1973, so that it could properly report the earnings of the Fein-Christian Companies in its 1973 first quarter earnings. Moreover, McDonald's chose the date of the initial June registration. In choosing this date, McDonald's hoped to avoid the expense associated with its having to prepare new financials. Fifth, though in the course of negotiating the final deal Baer suggested changes in the Agreement and Plan of Merger, we find that his actions as petitioners' attorney do not support the inference that petitioners had a preconceived intention or commitment to sell the McDonald's stock they were to receive. In asking for demand registration rights, Baer was acting on his own initiative, hoping to secure for petitioners a benefit, which his experience in handling the sale of privately held companies to larger, publicly traded concerns had taught him was a necessity. [10] Moreover, Baer's insistence that the merger hinge on an approved listing of the shares on the NYSE represents nothing more than a tough bargaining position from *448 which a future compromise, in the form of indemnification rights running to petitioners, was forthcoming. Additionally, we, in this case, found nothing in Baer's accepted request, that petitioners be allowed to substitute security or securities of similar value for those pledged McDonald's shares held in escrow, which supports a position that petitioners possessed a pre-merger intent to "cash out" their stock holdings in McDonald's. This request on Baer's part again reflects Baer's determined effort to achieve for petitioners maximum flexibility with respect to the McDonald's stock they would soon receive. [11]
*449 Sixth, the evidence in this record is noticeably void of the changes in structure and contract language which led to our finding in McDonald's of Zion that the Garb-Stern group "intended from the outset to sell their McDonald's stock at the earliest possible moment." McDonald's of Zion v. Commissioner, 76 T.C. at 989. In McDonald's of Zion, we commented that "the entire corporate structure of the acquisition was revised to reflect the possibility that * * * a subsequent sale by the Garb-Stern group was a real possibility." McDonald's of Zion v. Commissioner, 76 T.C. at 990. Additionally, we found that "The language of the investment-intent section of the [merger] agreement was changed to take into account the possibility that the Garb-Stern group might join in the proposed June registration." McDonald's of Zion v. Commissioner, 76 T.C. 990. Specifically, the investment-intent section of the Garb-Stern merger agreement read as follows: Each Stockholder represents and warrants that such Stockholder is acquiring the McDonald's Stock to be issued to such Stockholder hereunder for such Stockholder's own account without a view *450 to or the intention of the distribution thereof, except in compliance with the Federal Securities Act of 1933 (the Act). * * * [McDonald's of Zion v. Commissioner, 76 T.C. at 982; fn. ref. omitted.] However, The original draft of this section did not include the phrase "except in compliance with the [Act]." The phrase was added at the insistence of one of McDonald's attorneys to take into account the possibility that the Garb-Stern group might join in the registration planned for June [of] 1973. [McDonald's of Zion v. Commissioner, 76 T.C. at 982, n. 16.] In the instant case, no evidence was presented suggesting that the structure of the acquisition was conceived or revised to assure a sale by petitioners of their McDonald's shares. Furthermore, the investment-intent section of the Agreement and Plan of Merger executed by petitioners did not contain additional language to take into account the possibility that petitioners might join in the registration planned for June of 1973. The investment-intent language in the instant merger agreement read only that petitioners "jointly and severally represent[ed] to McDonald's that *451 they [were] taking the McDonald's stock for their own accounts for investment and without a view to the distribution thereof." Based on these facts, we reiterate our finding that, from the outset and at the time of the acquisition, petitioners did not intend to sell enough shares of their McDonald's stock to destroy their continued interest or propriety stake in the ongoing enterprise. At this point we make two comments. The first regards the sale by petitioners of all their stock within a short period of time after the merger in issue. This fact is likewise found in both McDonald's of Zion and Penrod. However, in these two cases, we reached opposite findings with regard to the stockholders' intentions to sell at the time of the mergers therein. These opposite findings point to the clear consequence that a sale of substantially all of a stockholder's shares acquired in a merger shortly after the merger's completion does not, in itself, result in the violation of the continuity of interest requirement. Cf. B. Bittker & J. Eustice, supra at 14-24 and 14-25. The second comment focuses on representations made in December of 1972 by Baer to McDonald's negotiators *452 that petitioners intended to sell 25 percent of their stock in late June of 1973 and 50 percent of their stock within two years of the merger's close. These statements of intent to sell were used by Baer in his bargaining for the required registration rights and in no way represented the true intentions of petitioners. At the time Baer made these representations, his clients had given no consideration to the possibility of their selling their soon-to-be-acquired McDonald's shares. Cf. B. Bittker & J. Eustice, supra at 14-24 and 14-25. Having resolved the issue of intent to sell, we now apply to the instant merger the step transaction doctrine as embodied in its three defining tests. Under both the end result test and the interdependence test, the intent of the parties to the merger is important. We have found that, at the time of the acquisition herein, petitioners did not intend to sell their McDonald's stock in violation of the continuity of interest requirement. We, consequently, conclude that the step transaction doctrine is not applicable under either of these two tests. See Penrod v. Commissioner, 88 T.C. at 1434; see also Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179 (1942); *453 Farr v. Commissioner, 24 T.C. 350 (1955). This conclusion comports with the Seventh Circuit's application of the end result test and the interdependence test in its McDonald's Restaurants of Illinois decision. In applying the end result test to the Garb-Stern transaction, the Seventh Circuit acknowledged the "history of the parties' relationships, the abortive attempt to buy some of the group's holdings, the final comprehensive deal, and the Garb-Stern group's determination to sell out even in the face of falling prices in the stock." McDonald's Restaurants of Illinois v. Commissioner, 688 F.2d at 524. The combination of these factors as detailed by the Seventh Circuit is not, however, apparent in the merger before us. Their combined absence, when coupled with petitioners' lack of intent to sell from the outset, augurs for the inapplicability of the end result test to reach a determination that the instant merger and stock sale be stepped together. In applying the interdependence test to the Garb-Stern transaction, the Seventh Circuit mentioned that this test concentrates on "whether the merger would have taken place without the guarantees *454 of saleability." McDonald's Restaurants of Illinois v. Commissioner, 688 F.2d at 524. Finding that the answer to that proposition was "no," the Seventh Circuit used the interdependence test to step together the merger and subsequent stock sale before it. In the instant case, we note that Mr. Baer's requests for mandatory registration rights and a guaranteed listing application might be deemed "guarantees of saleability." Such rights were, nevertheless, of no initial or significant concern to petitioners. The request for required registration rights was made strictly at Mr. Baer's insistence, and the rights' attainment was not the "deal breaker" Baer made it out to be. Additionally, Baer was unsuccessful in bargaining for the guaranteed listing application; petitioners had to settle for indemnification rights instead. Recognizing these facts, we are not prepared to respond "no" to a query focusing on whether the instant merger would have taken place without these "guarantees of saleability." This lack of negative response, coupled with petitioners' intent not to sell, leads to our conclusion that the interdependence test is not appropriate to step together the merger *455 and stock sale before us. We now turn to the most rigorous limitation on the step transaction doctrine -- the binding commitment test. This test is of greatest utility when multiple transactions span a period of several years. The Seventh Circuit, for example, has concluded that lack of a "binding commitment" should be determinative only in cases involving multi-year transactions; in other situations, the presence or absence of a "binding commitment" is simply one factor to be considered. See McDonald's Restaurants [of Illinois] v. Commissioner, 688 F.2d 520, 525 (7th Cir. 1982); Redding, 630 F.2d at 1178. * * * [Security Industrial Insurance Co. v. United States, 702 F.2d 1234, 1245 (5th Cir. 1983); see also Sooner Federal Savings and Loan Ass'n. v. United States, 4 Cl. Ct. 746, 754 (1984).] The transactions at issue herein were completed within a single tax year. Moreover, there was, at the time of the acquisition, no binding commitment in the form of a legal instrument obligating petitioners to sell their stock. Finally, on brief, respondent conceded that the binding commitment test had no application *456 at all to the instant merger. The binding commitment test, therefore, is inappropriate for our current purposes. We, however, point out that the Seventh Circuit in McDonald's Restaurants of Illinois v. Commissioner, supra, made its decision within a factual context imbued with the Garb-Stern group's direct and unwavering plan to sell virtually all their acquired McDonald's stock. Such is not the factual context before us. In spirit, the Garb-Stern group had committed themselves to the sale of virtually all their acquired McDonald's shares. By contrast, petitioners, in fact, did not commit themselves to a sale of their McDonald's shares. Acknowledging such, we find no binding commitment, in letter or spirit, which would justify or impel our stepping together the instant merger and stock sale. In our judgment the acquisition of the stock and subsequent sale were not steps in a plan the end result of which was to cash out petitioners' interests, were not interdependent steps, and were not linked by a binding commitment. Under these circumstances, we hold that the instant merger and stock sale should not be stepped together, that petitioners' ownership of the *457 McDonald's stock satisfied the continuity of interest requirement, and that the acquisition of stock constituted a reorganization within the meaning of section 368(a)(1)(A). We have found as fact that, at the time of the instant merger, the acquired shareholders did not intend to sell the stock acquired by them. We respectfully submit that the instant case is factually distinguishable from the case considered by the Seventh Circuit in McDonald's Restaurants of Illinois. To reflect the foregoing, Decisions will be entered for the petitioners in docket nos. 7369-76, 7370-76, 7372-76, 7373-76, 7374-76, 7375-76, 11092-76, 11093-76, 3740-77, and 3892-77. Decision will be entered under Rule 155 in docket no. 7371-76. Footnotes
1. Cases of the following petitioners are consolidated herewith: Estate of F. Thomas Christian, Deceased, Linda A. Steele and Catherine J. Rodino, Co-Executrixes, and June L. Christian, Transferees, docket No. 7370-76; Estate of F. Thomas Christian, Deceased, Linda A. Steele and Catherine J. Rodino, Co-Executrixes, and June L. Christian, docket No. 7371-76; Estate of F. Thomas Christian, Deceased, Linda A. Steele and Catherine J. Rodino, Co-Executrixes, and June L. Christian, Transferees, docket No. 7372-76; Harry Fein and Lillian Fein, docket No. 7373-76; Harry Fein and Lillian Fein, Transferees, docket No. 7374-76; Harry Fein and Lillian Fein, Transferees, docket No. 7375-76; Harry Fein, Transferee, docket No. 11092-76; Estate of F. Thomas Christian, Deceased, Linda A. Steele and Catherine J. Rodino, Co-Executrixes, Transferee, docket No. 11093-76; Harry Fein, Transferee, docket No. 3470-77; and Estate of F. Thomas Christian, Deceased, Linda A. Steele and Catherine J. Rodino, Co-Executrixes, Transferee, docket No. 3892-77.↩
2. Pursuant to Rule 63 of the Tax Court's Rules of Practice and Procedure, petitioner moved this Court to substitute the Estate of Elizabeth Christian, Deceased, Linda A. Steele and Catherine J. Rodino, Co-Executrixes, as party petitioner for Elizabeth Christian in docket No. 7369-76. This motion was granted April 9, 1987. Unless otherwise indicated, statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All rule references are to Tax Court Rules of Practice and Procedure.↩
3. The concessions in this case are as follows: With respect to the assignments of error contained in docket No. 7370-76, Fred Thomas Christian and June L. Christian, and docket No. 7375-76, Harry Fein and Lillian Fein, which address the notices of transferee liability sent to these individuals as transferees of the assets of F. & C. Enterprises, Inc., for its taxable year ended February 28, 1973, respondent concedes the adjustments to income determined with respect to the transferee liability of each petitioner for income tax and interest as transferee of the assets of F. & C. Enterprises, Inc. With respect to docket No. 7372-76, Fred Thomas Christian and June L. Christian, and docket No. 7374-76, Harry Fein and Lillian Fein, in which petitions there are assignments of error which address the notices of the transferee liability sent to these individuals as transferees of the assets of L. & J. Corporation for its taxable year ended February 28, 1973, respondent concedes all adjustments set forth in such notices of transferee liability such that there is no liability due from each of these individuals for income tax and interest as transferee of the assets of L. & J. Corporation, for the taxable year ended February 28, 1973. With respect to docket No. 11093-76, Fred Thomas Christian, and docket No. 11092-76, Harry Fein, in which the petitions address the adjustments set forth in the notices of transferee liability sent to these individuals as transferees of the assets of F. & C. Enterprises, Inc., for its taxable year ended February 28, 1973, respondent concedes all adjustments set forth in the notices of transferee liability so that there is no liability due from either individual for income tax and interest as transferee of the assets of F. & C. Enterprises, Inc. for the taxable year ended February 28, 1973. With respect to docket No. 3892-77, Fred Thomas Christian, and docket No. 3740-77, Harry Fein, in which the petitions address the adjustments set forth in the notices of transferee liability sent to these individuals as transferees of the assets of L. & J. Corporation for the taxable year ended February 28, 1973, respondent concedes all adjustments set forth in the notice of transferee liability such that there is no liability due from either individual for income tax and interest as transferee of the assets of L. & J. Corporation for the taxable year ended February 28, 1973. With respect to respondent's "Amendment to Answer Asserting Claim For Increased Deficiency Pursuant to Section 6214(a) of The Internal Revenue Code of 1954↩ for the Taxable Year 1973" as asserted solely with respect to docket No. 7371-76, Estate of Fred Thomas Christian, Deceased, Linda A. Steele and Catherine J. Rodino, Co-Executrixes, and June L. Christian, the parties have agreed to resolve the issue of whether these petitioners are entitled to a loss from the oil and gas shelter (An-Son, Indiana, 1973 LTD) claimed in the amount of $ 40,273.58 on a 1973 U.S. Individual Income Tax Return. Petitioners concede liability for an increased deficiency in tax of $ 1,000 for the year 1973. In reaching the resolution, petitioners have conceded that income in the year 1973 is to be increased by $ 40,273.58 since no entitlement exists for a claimed partnership loss deduction from An-Son, Indiana, 1973 LTD. The parties have further agreed that in reaching the resolution, petitioners are allowed an additional net operating loss carryback from the year 1975 to the year 1973 in the amount of $ 26,089.57. The parties have further agreed the issue raised by respondent's Amendment to Answer Asserting Claim For Increased Deficiency does not incorporate nor affect the adjustments set forth in the statutory notice of deficiency issued to Fred Thomas Christian and June L. Christian for the taxable year ended December 31, 1973.
4. McDonald's common stock had not paid a dividend from 1968 up to and including October 3, 1973.↩
5. The costs of a registration can be between $ 150,000 and $ 200,000.↩
6. In this regard, we note that Fein intended to retire after the sale of the business and did so. As of February 1973, Fein had a net worth of approximately $ 750,000 exclusive of his interests in the Fein-Christian Companies. Substantially all of Fein's other net worth was in the form of readily marketable securities. Fein was financially able to retire on the income from these other investments.↩
7. For example, on January 2, 1973, McDonald's stock closed at $ 75 3/8. By February 28, 1973, the stock closed at $ 64 1/8. From March to June 13, 1973, the stock's closing price generally hovered around the mid-sixties. By June 25, 1973, however, the stock closing price had fallen to $ 53 7/8.↩
8. This October registration and the aborted June registration were the same registrations in which petitioners were involved.↩
9. We address this issue first because respondent's argument is, to a great extent, premised on an ultimate factual finding that "petitioners had a pre-merger intent to sell the McDonald's common stock which they acquired as a part of McDonald's acquisition of their corporations."↩
10. We note the similarity of Baer's bargaining stance with that of Mr. Reed, the attorney for taxpayers in Penrod v. Commissioner, 88 T.C. 1415 (1987). In Penrod, we found as a fact that "It was Mr. Reed's practice to negotiate for such registration rights on behalf of his clients each time he represented shareholders in a corporate acquisition. The Penrods made no express request that he negotiate for registration rights." Penrod v. Commissioner, 88 T.C. at 1419. That both of these attorneys would negotiate for demand registration rights reflects a common perception among mergers and acquisitions attorneys that a target's "shareholders may want to seek -- as part of the [parent-target] acquisition agreement -- contractual demand and/or piggyback registration rights" in those transactions in which a parent acquires a target's "stock in a voluntary exchange offer for [the parent's] securities which are not registered." M. Ginsburg & J. Levin, Mergers, Acquisitions and Leveraged Buyouts III, at 2211-2212 (1989). Though a target's shareholders may be unsuccessful in receiving such rights, such rights' negotiation would appear to be a sine qua non of any merger paralleling in structure the merger before us. ↩
11. We find it anomalous that respondent on brief would concentrate much of his efforts on showing that Baer's request that petitioners be entitled to substitute collateral for the escrowed McDonald's shares, representing ten percent of the consideration petitioners received on the merger, demonstrated petitioners' pre-merger intent to destroy their continuity of interest. The substitution of collateral, at most, represents a desire to sell only ten percent of the acquired shares, an amount whose sale in a short time period after a merger would not, of itself, represent a sale of a substantial interest in an ongoing enterprise and a violation of the continuity of interest requirement. Cf. Penrod v. Commissioner, 88 T.C. at 1435-1436↩, where we noted that an intended sale of approximately one-third of a stockholder's interest in acquired shares in a sale occurring in a relatively short time frame after a merger did not constitute a sale of a substantial interest in the acquiring corporation and, consequently, did not constitute a violation of the continuity of interest requirement. Respondent's efforts would have been better directed toward a discussion which clearly revealed a pre-merger intent on petitioners' part to sell the other 90 percent of the McDonald's shares they already had in their possession.