**NOVACARE, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 97–234T.

United States Court of Federal Claims.

March 25, 2002.

Charles E. Dorkey III, Torys, New York City, attorney of record for the plaintiff. With whom was David Wawro, of counsel.

Charles M. Ruchelman, United States Department of Justice, Tax Division, Court of Federal Claims Section, Washington, D.C., Mildred L. Seidman, Chief, Court of Federal Claims Section and David Gustafson, Assistant Chief, Court of Federal Claims Section, attorneys of record for defendant.

## OPINION

HORN, Judge.

This claim for a tax refund comes before the court on plaintiff's motion for partial summary judgment and defendant's cross-motion for summary judgment. The case involves plaintiff, NovaCare, Inc.'s, merger with Rehab Systems Company (RSC) in 1991 and NovaCare's subsequent sale of all of its RSC stock to HealthSouth for cash in 1995. NovaCare's claim is dependent on whether its merger with RSC was a cash purchase or a reorganization. Pursuant to the discussion which follows, the court finds that resolution of the issue requires an analysis of evidence beyond that submitted by the plaintiff in its partial motion for summary judgment and defendant in its cross-motion for summary judgment. Therefore, summary judgment is inappropriate at this time.

## FINDINGS OF FACT

At the time of the merger at issue, Nova-Care was a corporation which provided contract rehabilitation services to health care institutions, principally nursing homes. At the time of the merger, NovaCare's stock was traded on the NASDAQ National Market System (NASDAQ). Seven months after NovaCare's merger with RSC, NovaCare stock began trading on the New York Stock Exchange (N.Y.SE). RSC operated rehabilitation hospitals and community rehabilitation programs. Prior to the merger, substantially all of the RSC stock was owned by five individual founders (RSC Founders) and nine limited partnerships and corporations that had invested in the company (RSC Investors). There was no public market for the stock.

On May 17, 1991, NovaCare made an offer to RSC's board of directors to acquire RSC for $90,000,000.00,[1] payable in shares of NovaCare stock. In the two weeks following the offer, NovaCare, RSC Acquisition Corporation, a wholly owned subsidiary of Nova-Care, and RSC negotiated an Agreement and Plan of Merger, which representatives from the parties executed on June 3, 1992. Under the agreement, RSC stockholders received 25.7879 shares of NovaCare stock for every one share of RSC stock they held. In addition, the parties agreed to register the stock with the SEC as promptly as possible. In this regard, NovaCare filed a Registration Statement on Form S–4 with the SEC on June 19, 1991. Additionally, NovaCare filed an Amended Registration Statement on July 31, 1991. According to the joint stipulations submitted to the court, the parties also agreed to treat the merger as a "pooling of interests"[2] for accounting purposes and as a tax-free reorganization for federal income tax purposes.

The merger closed on August 9, 1991, resulting in RSC merging with RSC Acquisition Corporation and continuing in existence as a subsidiary of NovaCare. In connection with the closing, the RSC Investors signed representations which the parties intended would ensure that the merger would qualify as a tax-free reorganization and meet the continuity of interest requirement set forth in Treasury Regulations §§ 1.368–1(b) and 1.368–2(a) (1991) and applicable case law. The representations signed by representatives of the RSC Investors were identical and stated: "The undersigned hereby represents that it has no present plan or intention to sell or otherwise dispose of more than 25% of the shares of Common Stock, par value $.01 per share, of NovaCare, Inc. which the

1. The numbers used in the Findings of Fact section of this opinion are based on the numbers provided to the court by the parties in their Joint Stipulations of Facts and Joint Exhibits.

2. Two methods for combining financial statements of merged companies are the purchase method and the pooling of interests method. *See* Gary W. Emery, *Corporate Finance: Principles and Practice* 835 (1998). Under the purchase method:

> The acquired company's assets are recorded in the acquiring company's books at the cost es-

tablished by the merger .... This cost usually is higher than the assets' book values and the difference is recognized as goodwill.... Consequently, using the purchase method of accounting reduces reported earnings per share but has no effect on cash flows.

*Id.* Under the pooling of interests method, "[t]he book values of the two companies' assets are simply added together.... No goodwill is created ... consequently, there is no effect on either cash flows or earnings." *Id.*

undersigned will receive in the Merger." In order to ensure that the merger would be accounted for as a pooling of interests, those stockholders who were deemed "affiliates" of NovaCare or RSC signed "Affiliates Agreements." In those agreements, the affiliates promised not to sell any NovaCare stock acquired through the merger until NovaCare had publicly released a report including the combined financial results of NovaCare and RSC for a "pooling period" of at least thirty days of combined operations. All except one of the RSC Investors and all of the RSC Founders signed affiliates agreements.

When the merger closed, the RSC stockholders tendered their RSC shares to NovaCare and received approximately 6,000,000 shares of NovaCare stock in exchange. After the merger, certain former RSC stockholders sold the shares of NovaCare that they had acquired through the merger to third parties on the NYSE or NASDAQ. The first wave of sales occurred when RSC stockholders who were not bound by affiliates agreements sold approximately 661,632 shares of NovaCare stock before the end of the pooling period. These sales amounted to approximately eleven percent of the NovaCare shares of stock transferred to RSC stockholders in the merger.

The pooling period ended on October 17, 1991 when NovaCare publicly released its earnings report for the quarter ending on September 20, 1991. The next day, RSC stockholders sold or transferred as gifts 2,031,340 shares of NovaCare, accounting for approximately thirty-three percent of the shares of NovaCare stock distributed in the merger. By the end of 1991, RSC stockholders transferred an additional 473,695 shares.

In 1992, RSC stockholders sold 1,032,405 shares of NovaCare stock and gave 46,400 shares of NovaCare stock as charitable con

tributions and gifts. Finally, RSC Investors distributed 997,162 shares of NovaCare stock to their partners in the same year. Thus, by December 31, 1992, RSC stockholders had transferred approximately 5,242,634 shares of NovaCare stock, or roughly eighty-seven percent of the shares of the NovaCare stock, they had received in the merger.

On May 19, 1995, NovaCare sold RSC to HealthSouth in a taxable transaction for $217,852,000.00. NovaCare's consolidated federal income tax return for the taxable year ending on June 30, 1995 reflected the sale of the RSC stock to HealthSouth. On that return, NovaCare calculated its gain or loss on the sale of RSC stock to HealthSouth under the assumption that NovaCare's merger with RSC was a tax-free reorganization pursuant to section 368 of the Internal Revenue Code (Code) (1994).[3] Accordingly, plaintiff used the "carry-over" method for calculating its basis in the RSC stock, by which a subsequent owner's basis in acquired property is the same as the basis the prior owner held in the property. Thus, NovaCare used the basis of the RSC stockholders as its own tax basis. Using the carry-over basis, NovaCare realized a gain on the sale of RSC to HealthSouth.

On April 3, 1996, NovaCare timely filed a tax refund claim with the IRS claiming a refund of $31,976,787.00 plus interest for the taxable year ending on June 30, 1995. In the refund claim, NovaCare calculated its gain or loss on the sale of RSC stock to HealthSouth based on the conclusion that NovaCare's merger with RSC had been a cash purchase.[4] In its tax refund claim NovaCare used a "stepped up" basis, by which a subsequent owner's basis in appreciated property is increased from the prior owner's basis to the price of the property at the time of the transfer. Thus, NovaCare calculated its basis reflecting its purchase price for the RSC

---

3. Generally, a reorganization occurs when two corporations merge resulting in a modification of form and continued involvement by the owners of both corporations with "no basic change in relationships and not a significant 'cashing in' of proprietary interests to justify contemporaneous taxation." *King Enters., Inc. v. United States,* 189 Ct.Cl. 466, 473, 418 F.2d 511, 515 (1969).

4. Generally, a cash purchase occurs when two corporations merge and the transaction involves the purchase by one corporation of the assets of another. *See Pinellas Ice & Cold Storage Co. v. Commissioner,* 287 U.S. 462, 469, 53 S.Ct. 257, 77 L.Ed. 428 (1933). The owners of·the purchased organization have "cashed-in" and are no longer involved in the business. *See King Enters., Inc. v. United States,* 189 Ct.Cl. at 473, 418 F.2d at 515.

stock. Under this method, NovaCare realized a loss on the sale of RSC stock to HealthSouth. The District Director for the IRS disallowed NovaCare's refund claim. NovaCare then filed suit in this court. Subsequently, plaintiff filed a motion for partial summary judgment and defendant filed a cross-motion for summary judgment.

## DISCUSSION

The parties have submitted cross-motions for summary judgment on liability pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States*, 49 Fed.Cl. 648, 651 (2001); *Becho, Inc. v. United States*, 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied, en banc declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States*, 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.*, 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly and Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed. Cir.), *reh'g and reh'g en banc denied* (2001); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir.1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues, must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied* (1995)), *reh'g denied, en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir.2000), *cert. denied* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir. 1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Intern., Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir.2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.2001).

The issue currently before the court is whether the merger between NovaCare and RSC was a reorganization or a cash pur-

chase. The characterization of the merger as a reorganization or a cash purchase is determinative of NovaCare's basis in RSC, which plaintiff should use to calculate its gain or loss on the sale of RSC to HealthSouth.[5] If the merger between NovaCare and RSC is termed a reorganization, NovaCare's basis in stock acquired in the reorganization would be the same as it would be in the hands of the RSC stockholders. I.R.C. § 362(b). As a result, NovaCare would recognize a gain on its sale of RSC to HealthSouth and no refund would be due to the plaintiff. If the merger is labeled a taxable purchase, NovaCare would be entitled to a "stepped-up" basis equal to the fair market value of the consideration it paid to the RSC stockholders in the merger. I.R.C. § 1012. According to plaintiff,[6] applying a "stepped-up" basis to its sale of RSC to HealthSouth would result in a loss to NovaCare. Ultimately, the court must determine whether the merger satisfies the continuity of interest requirement referred to in the Treasury Regulations, sections 1.368–1(b) and 1.368–2(a), and case law, in order to qualify as a tax-free reorganization under section 368 of the Code.

Plaintiff argues that the rapid transfer of NovaCare stock by RSC stockholders following the merger is sufficient to prove that the RSC stockholders did not maintain a continuity of interest in the surviving corporation, as required by Treasury Regulations §§ 1.368–1(b) and 1.368–2(a) and Supreme Court case law for a merger to constitute a reorganization, and that, therefore, the merger should be termed a cash purchase. Defendant alleges that without proof that at the time of the merger the RSC stockholders intended to sell their shares received in the merger, the post-merger sales are insufficient to dis-

rupt continuity of interest. Defendant alleges that the RSC stockholders did not intend to sell their shares at the time of the merger and that, therefore, the merger was a reorganization. Plaintiff counters that if intent is relevant, it is a genuine issue of material fact and not suitable for summary judgment. Pursuant to the following discussion, the court finds that continuity of interest is not disrupted based solely on post-merger sales. Neither, however, is the intent of the parties at the time of the merger entirely dispositive. Finally, there are genuine issues of material fact which preclude the court from entering summary judgment at this time.

The Internal Revenue Code contains specific provisions designed to relieve certain corporate mergers from an income tax when there is merely the " ' "recasting of the same interests in a different form." ' " *Paulsen v. Commissioner*, 469 U.S. 131, 136, 105 S.Ct. 627, 83 L.Ed.2d 540 (1985) (quoting *Southwest Natural Gas Co. v. Commissioner*, 189 F.2d 332, 334 (5th Cir.), *cert. denied*, 342 U.S. 860, 72 S.Ct. 88, 96 L.Ed. 647 (1951) (quoting *Commissioner v. Gilmore's Estate*, 130 F.2d 791, 794 (3d Cir.1942))). As the United States Court of Claims has stated:

> [C]ertain transactions constitute corporate readjustments and are not the proper occasion for the incidence of taxation. Congressional policy is to free from tax consequences those corporate reorganizations involving a continuity of business enterprise under modified corporate form and a continuity of interest on the part of the owners before and after, where there is no basic change in relationships and not a sufficient 'cashing in' of proprietary interests to justify contemporaneous taxation.

---

**5.** According to section 1001 of the Internal Revenue Code, the gain or loss from a sale or disposition of property is determined by subtracting the adjusted basis from the amount realized. I.R.C. § 1001. The basis of property is the cost of such property at the time it was acquired, or as otherwise provided in the Code. *Id.* § 1012. The amount realized is generally the sum of any cash received plus the fair market value of any property received in the sale or disposition. *Id.* § 1001(b).

**6.** Defendant has claimed that, assuming that the merger between RSC and NovaCare was a cash

purchase, NovaCare improperly calculated its "stepped up" basis. The parties agreed to set aside this issue for resolution at a later time, if necessary. Defendant also has argued that under *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir.) (en banc), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967), plaintiff cannot recover previously paid taxes by contradicting the express language of the Agreement and Plan of Merger between NovaCare and RSC after its execution. The court will consider defendant's *Danielson* argument following the issuance of this decision.

*King Enters., Inc. v. United States,* 189 Ct. Cl. at 473, 418 F.2d at 515.

■ Recognizing that "the mere purchase for money of the assets of one company by another is beyond the evident purpose of the provision [of the Code on reorganizations], and has no real semblance to a merger or consolidation[,]" *Pinellas Ice & Cold Storage Co. v. Commissioner,* 287 U.S. at 470, 53 S.Ct. at 260, earlier United States Supreme Court cases evidenced concern that taxable purchases could be structured to satisfy the literal terms of the reorganization provisions of the Code. *Accord Gregory v. Helvering,* 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935); *Helvering v. Minn. Tea Co.,* 296 U.S. 378, 385–86, 56 S.Ct. 269, 80 L.Ed. 284 (1935). Consequently, the Court confined the benefits of the Code provisions on reorganizations to those transactions which not only satisfied the literal terms of the Code, but also furthered their purpose by requiring "that the taxpayer's ownership interest in the prior organization must continue in a meaningful fashion in the reorganized enterprise". for a transaction to qualify as a tax free reorganization. *Paulsen v. Commissioner,* 469 U.S. at 136, 105 S.Ct. 627 (citing *Pinellas Ice & Cold Storage Co. v. Commissioner,* 287 U.S. at 468–70, 53 S.Ct. 257). In addition, the Supreme Court required that "'this interest must be definite and material; it must represent a substantial part of the value of the thing transferred.'" *Id.* (quoting *Helvering v. Minn. Tea Co.,* 296 U.S. at 385, 56 S.Ct. 269).

Now known as the continuity of interest doctrine, the requirements articulated by the Supreme Court are codified at Treasury Regulations §§ 1.368–1(b) which states:

Under the general rule, upon the exchange of property, gain or loss must be accounted for if the new property differs in a material particular, either in kind or in extent, from the old property. The purpose of the reorganization provisions of the Code is to except from the general rule certain specif-

ically described exchanges incident to such readjustments of corporate structures made in one of the particular ways specified in the Code, as are required by business exigencies and which effect only a readjustment of continuing interest in property under modified corporate forms. Requisite to a reorganization under the Code are a continuity of the business enterprise under the modified corporate form, and ... a continuity of interest therein on the part of those persons who, directly or indirectly, were the owners of the enterprise prior to the reorganization. The continuity of business enterprise requirement is described in paragraph (d) of this section. The Code recognizes as a reorganization the amalgamation (occurring in a specified way) of two corporate enterprises under a single corporate structure if there exists among the holders of the stock and securities of either of the old corporations the requisite continuity of interest in the new corporation, but there is not a reorganization if the holders of the stock and securities of the old corporation are merely the holders of short term notes in the new corporation. In order to exclude transactions not intended to be included, the specifications of the reorganization provisions of the law are precise. Both the terms of the specifications and their underlying assumptions and purposes must be satisfied in order to entitle the taxpayer to the benefit of the exception from the general rule.

Treas. Reg. § 1.368–1(b) (1991).

Plaintiff argues that post-merger sales alone are sufficient to disrupt continuity of interest. NovaCare, however, has not cited to any case which relies solely on post-merger sales to find a disruption of continuity of interest.[7] Plaintiff's argument requires the court to determine whether the post-merger sales should be considered events independent of the merger between RSC and NovaCare or as related steps in the merger. In

---

7. On January 28, 1998, the IRS issued a regulation requiring courts to disregard "a mere disposition of stock of the issuing corporation received in a potential reorganization to persons not related ... to the issuing corporation" when engaging in a continuity of interest analysis.

Continuity of Interest and Continuity of Business Enterprise, 63 Fed.Reg. 4174, 4180 (Jan. 28 1998) (codified at Treas. Reg. § 1.368–1(e)(1)(i)). This regulation forecloses an argument using plaintiff's theory for any transaction occurring after January 28, 1998.

*King Enterprises, Inc. v. United States,* the United States Court of Claims wrote:

> The problem of deciding whether to accord the separate steps of a complex transaction independent significance, or to treat them as related steps in a unified transaction, is a recurring problem in the field of tax law.[8] The principle that even extended business transactions have determinate limits for tax purposes is based on a strong preference for "closed transactions" upon which to impose tax consequences. This preference is tempered, however, with respect for the integrity of an entire transaction. Accordingly, the essence of the step transaction doctrine is that an "integrated transaction must not be broken into independent steps or, conversely, that the separate steps must be taken together in attaching tax consequences." Bittker and Eustice, *Federal Income Taxation of Corporations and Shareholders,* p. 18 (1966); *see also, Buhl v. Kavanagh,* [118 F.2d 315, 320 (6th Cir.1941)]. The mere recitation of the doctrine, however, does not clarify the necessary relationship between the steps requisite to characterization as an integrated transaction.

189 Ct.Cl. at 474–75, 418 F.2d at 516.

█ The step transaction doctrine is a " ' "judicial device expressing the familiar principle that in applying the income tax laws, the substance rather than the form of the transaction is controlling." ' " *Brown v. United States,* 782 F.2d 559, 563 (6th Cir. 1986) (quoting *Redding v. Commissioner,* 630 F.2d 1169, 1175 (7th Cir.1980)) (quoting Comment, *Taxation of Stock Rights,* 51 Cal. L.Rev. 146, 157 (1963) (footnote omitted)), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 338, (1981). According to the step-transaction doctrine, "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." *Commissioner v. Clark,* 489 U.S. 726, 738, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989). "By thus 'linking together all interdependent steps with legal or business significance, rather than taking them in isolation,' federal tax liability may be based 'on a realistic view of the entire transaction.' " *Id.* (quoting 1 B. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 4.3:5, p. 452 (1981)).

█ The Court of Appeals for the Federal Circuit recognizes two tests for determining when separate incidents may be collapsed into a single transaction for tax purposes: the end result test and the interdependence test.[9] *King Enters., Inc. v.*

8. In a footnote, the *King Enterprises* court stated:
 In coping with this and related problems, courts have enunciated a variety of doctrines, such as step transaction, business purpose, and substance over form. Although the various doctrines overlap and it is not always clear in a particular case which one is most appropriate, their common premise is that the substantive realities of a transaction determine its tax consequences.
 *King Enters., Inc. v. United States,* 189 Ct.Cl. at 474 n. 6, 418 F.2d at 516 n. 6.

9. Many courts recognize, but seldom apply a third test known as the "binding commitment test." *See True v. United States,* 190 F.3d 1165, 1175 n. 8 (10th Cir.), *reh'g en banc denied* (1999); *Associated Wholesale Grocers, Inc. v. United States,* 927 F.2d 1517, 1523 n. 6 (10th Cir.1991); *Gaw v. Commissioner,* T.C.M. (RIA) 1995–531, n. 101, 1995 WL 664592 (1995). Under the binding commitment test, courts only apply the step transaction doctrine " ' 'where the taxpayer is subject to an obligation or binding commitment, at the time the first step is entered into, to pursue the successive steps in a series of transactions,' usually spanning several years." *True v. United States,* 190 F.3d at 1175 n. 8 (quoting Jacob

Mertens, Jr., *The Law of Federal Income Taxation* § 43.256 (1997)). The binding commitment test generally is only applicable to cases in which a substantial period of time has passed between the steps examined. *Id.* In *King Enterprises, Inc. v. United States,* the United States Court of Claims expressly rejected the application of the binding commitment test to the step transaction doctrine. 189 Ct.Cl. at 476–77, 418 F.2d at 518. The court stated that the United States Supreme Court case, *Commissioner v. Gordon,* 391 U.S. 83, 96, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968), from which courts have derived the binding commitment test:

> contains not the slightest indication that the Supreme Court intended the binding commitment requirement as the touchstone of the step transaction doctrine in tax law. Nor is there any indication that the Court intended to overrule any prior decisions applying the step transaction doctrine to other types of transactions where there were no binding commitments. On the contrary, the opinion addressed a narrow situation (a D reorganization) involving a specific statutory requirement (divestiture of control), and limited the potential for dilution and circumvention of

*United States,* 189 Ct.Cl. at 475, 418 F.2d at 516–17; *see also True v. United States,* 190 F.3d 1165, 1174–75 (10th Cir.), *reh'g en banc denied* (1999); *Sec. Indus. Ins. Co. v. United States,* 702 F.2d 1234, 1244–45 (5th Cir.1983). According to the end result test, courts will apply the step transaction doctrine when it appears that formally distinct steps " 'were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.' " *King Enters., Inc. v. United States,* 189 Ct.Cl. at 475, 418 F.2d at 516 (quoting Herwitz, *Business Planning,* p. 804 (1966)). Thus, if the separate steps are designed and executed as parts of a plan to achieve a specific result, the steps will be consolidated and treated as a single transaction. *Id.; True v. United States,* 190 F.3d at 1175 (citing *Kanawha Gas and Utils. Co. v. C.I.R.,* 214 F.2d 685, 691 (5th Cir.1954)). "The taxpayer's subjective intent is especially relevant under this test because it allows us to determine whether the taxpayer directed a series of transactions to an intended purpose." *True v. United States,* 190 F.3d at 1175 (citing *Brown v. United States,* 782 F.2d at 563).

■ The interdependence test joins formally distinct steps for tax purposes when, " 'on a reasonable interpretation of objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series.' " *King Enters., Inc. v. United States,* 189 Ct.Cl. at 475, 418 F.2d at 516 (quoting Paul and Zimet, *Step Transactions, Selected Studies in Federal Taxation* 200, 254 (2d Series, 1938)). Separate steps will be consolidated if "it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts." *Kuper v. Commissioner,* 533 F.2d 152, 156 (5th Cir.1976). In this regard, the interdependence test relies less on the intentions of the parties because it is concerned with the relationship between the separate steps and not an intended end result. *True v. United States,* 190 F.3d at 1175. To en-

sure that the interdependence test maintains its objective nature, the *True* court suggested comparing the separate incidents in question with those which might occur in otherwise normal business settings. *Id.* at 1176 (citing *Merryman v. Commissioner,* 873 F.2d 879, 881 (5th Cir.1989)).

"More than one test might be appropriate under any given set of circumstances; however, the circumstances need only satisfy one of the tests in order for the step transaction doctrine to operate." *True v. United States,* 190 F.3d at 1175 (citing *Associated Wholesale Grocers, Inc. v. United States,* 927 F.2d 1517, 1527–28 (10th Cir.1991) for finding end result test inappropriate yet applying step transaction doctrine under interdependence test); *see also King Enters., Inc. v. United States,* 189 Ct.Cl. at 478–480, 418 F.2d at 516–519 (applying step transaction doctrine under end result test after rejecting binding commitment test and without analyzing the merger under the interdependence test).

The step transaction doctrine cannot be described in general terms and then applied to a fact pattern without reference to the specific tax code provisions involved. *King Enters., Inc. v. United States,* 189 Ct.Cl. at 475, 418 F.2d at 516; *Lareau v. United States,* 78–2 U.S. Tax Cas. (CCH) ¶ 16,305, 86,049 (Ct.Cl.1978) (trial division). "It has been persuasively suggested that 'the aphorisms about "closely related steps" and "integrated transactions" may have different meanings in different contexts, and that there may be not one rule, but several, depending on the substantive provision of the Code to which they are being applied.' " *King Enters., Inc. v. United States,* 189 Ct. Cl. at 475, 418 F.2d at 516 (quoting Mintz and Plumb, *Step Transactions* 247, 252–253 (1954)); *accord Lareau v. United States,* 78–2 U.S. Tax Cas. (CCH) ¶ 16,305, 86,049, 1978 WL 4215. Therefore, ideally, this court should look for guidance to cases which have applied the step transaction doctrine to situations in which sales of stock received in a merger occur after an alleged reorganization

---

that requirement by prohibiting the indefinite extension of divestiture distributions. Its interpretation should be so limited. Clearly, the step transaction doctrine would be a dead let-

ter if restricted to situations where the parties were bound to take certain steps.
*King Enters., Inc. v. United States,* 189 Ct.Cl. at 477, 418 F.2d at 518 (footnote omitted).

to determine whether the step transaction doctrine requires the court to consider evidence outside of the post-merger sales when analyzing the continuity of interest requirement.

The primary case applying the step-transaction doctrine to post-merger sales was *McDonald's Restaurants of Illinois, Inc. v. Commissioner*, 688 F.2d 520 (7th Cir.1982). In that case, McDonald's Restaurants sought to acquire the McDonald's franchises owned by a group of investors. *Id.* at 521. The investment group wanted cash, while McDonald's Restaurants wished to acquire the franchises for stock. *Id.* As a compromise, the parties agreed that the franchises would merge into McDonald's Restaurants and the investors would receive 361,235 shares of unregistered common stock in McDonald's Restaurants. *Id.* at 522. Under the agreement, the investors "could participate in McDonald's planned June 1973 registration and underwriting or in any other registration and underwriting McDonald's might undertake within six years" of the merger. *Id.* In addition, the group had a one-time right to demand registration if McDonald's Restaurants did not effect a registration in the first year following the transaction. *Id.* Although the investors were not obligated to sell the stock, they intended to do so. *Id.* Within a year of the merger, McDonald's Restaurants proceeded with a registration, at which time the investment group sold virtually all of the stock acquired in the transaction. *Id.*

In *McDonald's Restaurants of Illinois, Inc. v. Commissioner*, the United States Court of Appeals for the Seventh Circuit analyzed the facts presented utilizing the step transaction doctrine to determine whether the merger was a reorganization or a cash purchase. *Id.* at 524. Beginning by applying the end result test, the *McDonald's* court found that the separate steps of the transaction had been taken to cash out the investment group, even though McDonald's Restaurants sought to structure the transaction like a reorganization for accounting purposes. *Id.* at 524. In making its determination, the court took into account a number of factual circumstances. *Id.* For example, the court stated:

Admittedly, not every transaction would be as pellucid as this one, but here, the history of the parties' relationships, the abortive attempt to buy some of the group's holdings, the final comprehensive deal, and the [investment] group's determination to sell out even in the face of falling prices in the stock all are consistent and probative. *Id.* (footnote omitted). Thus, to determine whether the parties intended the steps to result in a cash out of the investment group, the court took into account the totality of the circumstances surrounding the merger.

The *McDonald's* court also analyzed the case under the interdependence test. *Id.* The court found that when applied to post-merger sales and the continuity of interest requirement, the test "would ask whether the merger would have taken place without the guarantees of saleability . . . ." *Id.* The court looked to the positions of the parties during the negotiations and certain characteristics of the merger agreement in making its decision. *Id.* at 525. The court found that "[t]he very detail of the provisions about how McDonald's would ensure free transferability of the [investment] group's McDonald's stock shows that they were the quid pro quo of the merger agreement." *Id.* Instead of taking into account the totality of the circumstances, when analyzing the transaction under the interdependence test, the Seventh Circuit limited its discussion to the terms of the agreement and the positions the parties had taken during negotiations. *Id.* The court's treatment of the interdependence test reflected the test's practical nature and its focus on the relationship between the independent steps, rather than the parties' intended end result. *Id.* at 524.

Two Tax Court decisions have applied *McDonald's* to factual patterns involving post-merger sales, *Penrod v. Commissioner*, 88 T.C. 1415, 1987 WL 49335 (1987) and *Estate of Elizabeth Christian*, 57 T.C.M. (CCH) 1231, 1989 WL 88933 (1989). These cases, however, are not binding on this court and are less persuasive than they might otherwise have been because they appear inconsistent with each other, and with the *McDonald's* decision, in their application of the step transaction doctrine as it relates to post-

merger sales and the continuity of interest requirement.

In *Penrod*, an investment group, referred to by the Tax Court as the Penrods, owned a number of McDonald's franchises which McDonald's Restaurants wished to acquire. 88 T.C. at 1417–18. Because McDonald's Restaurants wished to use the pooling of interest method of accounting, McDonald's Restaurants offered to purchase the Penrods' McDonald's franchises for stock in McDonald's Restaurants. *Id.* At no time did the Penrods request cash for their franchises. *Id.* Moreover, as part of the agreement, certain members of the Penrods sought assurances that they would be allowed to remain and manage the McDonald's franchises. *Id.* at 1419. Under the final agreement, the Penrods received stock which SEC regulations required to be registered if sold in the first two years of ownership. *Id.* Accordingly, the agreement required McDonald's Restaurants to give the Penrods written notice of any proposed registration of stock and to include the Penrod stock in the registration if so requested. *Id.* In addition, the Penrods could inquire if McDonald's Restaurants planned a registration at a certain time, and if McDonald's Restaurants had not planned a registration in the near future, the Penrods could demand that McDonald's Restaurants register their stock at that time. *Id.* Finally, the Penrods obtained an opinion from their attorneys which described the agreement and stated that the Penrods did not intend to sell their McDonald's stock. *Id.* at 1420–21. After the merger, it became clear that McDonald's Restaurants did not wish the Penrods to remain involved in the management of the restaurants. *Id.* The Penrods decided to form their own fast-food restaurant chain and to sell their McDonald's shares to fund this new endeavor. *Id.* at 1421–23. The Penrods exercised their demand rights and McDonald's Restaurants subsequently registered the Penrods' McDonald's Restaurants stock, which was then sold. *Id.* at 1423.

The Tax Court applied the step transaction doctrine to the Penrod transaction and determined that the post-merger sales did not disrupt continuity of interest and that the transaction qualified as a reorganization. *Id.*

at 1437. The court identified the end result test as based upon the intent of the parties at the time of the merger. *Id.* at 1430; *see also True v. United States*, 190 F.3d at 1175 (citing *Brown v. United States*, 782 F.2d 559, 563 (6th Cir.1986) and noting that end result test requires inquiry into intent of the parties at the time of the merger). In discussing the interdependence test the *Penrod* court wrote that:

> since the interdependence test requires a court to find whether the individual steps had independent significance or whether they had meaning only as part of the larger transaction, the court may be called upon to determine the result the participants hoped to achieve. Thus, the interdependence test is a variation of the end result test.

*Penrod v. Commissioner*, 88 T.C. at 1430. Although the tax court in *Penrod* described the interdependence test as a "variation" of the end result test and, thus, appeared to distinguish the two tests, because the *Penrod* court's description of the interdependence test focused on the result the participants hoped to achieve, and, thus, their intent, the *Penrod* court erased any real distinction between the two tests. Analyzing the case under the interdependence test, after looking to the totality of the circumstances, the *Penrod* court found that the parties did not intend to sell the sales at the time of the merger. The *Penrod* court wrote: "[a]ccordingly, in our judgment, the acquisition of the stock and its subsequent sale were not interdependent steps, nor were they steps in a plan the end result of which was to cash out their interests in the restaurants." *Id.* at 1437. Instead of discussing the two tests separately, the *Penrod* court merged the determinations under the two tests and found that both tests could be resolved by determining the intent of the parties at the time of the merger. This result is inconsistent with the opinion in *King Enterprises, Inc. v. United States*, 189 Ct.Cl. at 476, 418 F.2d at 517, which noted that although both the end result and interdependence tests are faithful to the central purpose of the step transaction doctrine to reveal the substance of a transaction, there are real differences between the two tests. The *Penrod* decision also is incon-

sistent with subsequent cases which allowed litigants to argue for the application of the step transaction doctrine using either the end result or the interdependence tests. *See, e.g., True v. United States,* 190 F.3d at 1175; *Associated Wholesale Grocers, Inc. v. United States,* 927 F.2d at 1527–28.

*Estate of Elizabeth Christian,* 57 T.C.M. (CCH) 1231, a Tax Court memorandum decision, was another decision by the Tax Court which applied the step transaction doctrine to the issue of post-merger sales and continuity of interest. *Elizabeth Christian* involved a different acquisition of franchises by McDonald's Restaurants. *Id.* at 1234. McDonald's Restaurants, as in *Penrod,* offered the franchise owners stock in return for the franchises. *Id.* At no time did the franchise owners request cash. *Id.* at 1235. The franchise owners, however, insisted on registration rights to the McDonald's Restaurants stock they would receive. *Id.* at 1236. The merger agreement also allowed the franchise owners to force McDonald's Restaurants to conduct a public offering in which the franchise owners could sell all or some of their stock if McDonald's Restaurants had not conducted an offering by a specific time. *Id.* Notes from the franchise owners' attorney documented that the franchise owners did not intend to sell their McDonald's Restaurants stock. *Id.* at 1237. After the merger, however, the franchise owners decided to sell and did sell most of their stock at a McDonald's Restaurants public offering. *Id.* at 1237–38.

The Tax Court in *Elizabeth Christian* applied the step transaction doctrine to the facts presented and found that the merger satisfied the continuity of interest requirement and constituted a reorganization. *Id.* at 1244. Although the two cases were written by different Tax Court judges, in *Elizabeth Christian,* the court borrowed, verbatim, the text of the *Penrod* court to explain the end result and interdependence tests, including the characterization of the interdependence test as an intent based variation of the end result test. *See Estate of Elizabeth Christian,* 57 T.C.M. (CCH) at 1239–1240; *Penrod v. Commissioner,* 88 T.C. at 1428–1429. The *Elizabeth Christian* court cited the *Penrod* decision following the verbatim

selection. After laying out the step transaction tests, the Tax Court in *Elizabeth Christian* focused on determining the intent of the parties. *Estate of Elizabeth Christian,* 57 T.C.M. at 1241. After considering a number of factual circumstances, the *Elizabeth Christian* court determined that the franchise owners did not intend to sell their McDonald's shares at the time of the merger. *Id.* at 1242.

Determining the intent of the parties, however, did not resolve the issue in *Elizabeth Christian* as it did in *Penrod. Estate of Christian,* 57 T.C.M. at 1243. Instead, the *Elizabeth Christian* court performed a brief, but separate, analysis for each test drawing on evidence beyond the intent of the parties. *Id.* at 1243. With regard to the end result test, the Tax Court in *Elizabeth Christian* found that the absence of the factors present in *McDonald's Restaurants of Illinois, Inc. v. Commissioner,* 688 F.2d at 524, such as the " 'history of the parties' relationships, the abortive attempt to buy some of the group's holdings, the final comprehensive deal, and the [investment] group's determination to sell out even in the face of falling prices in the stock,' " when "coupled with petitioners' lack of intent to sell from the outset, augurs for the inapplicability of the end result test to reach a determination that the instant merger and stock sale be stepped together." *Estate of Elizabeth Christian,* 57 T.C.M. (CCH) at 1243. In analyzing the transaction under the interdependence test, the court in *Elizabeth Christian* applied the test designed in *McDonald's,* which asked whether the merger would have taken place without the guarantees of salability. *Id.* After answering that question in the affirmative the Tax Court tacked on an additional intent requirement, stating: "This lack of negative response, coupled with petitioners' intent not to sell, leads to our conclusion that the interdependence test is not appropriate to step together the merger and stock sale before us." *Id.* Consequently, there is a question as to whether the *Elizabeth Christian* decision is consistent with either the *Penrod* decision or the *McDonald's* decision. The *Elizabeth Christian* opinion does not consider the intent of the parties at the time of the merger dispositive,

as the *Penrod* decision did, and added an explicit intent requirement to the interdependence test, not mentioned in *McDonald's*.

Thus, because of the difficulties in reconciling the analyses in the Tax Court's *Penrod* and *Elizabeth Christian* decisions regarding the correct standards to apply when using the step transaction doctrine to consider post-merger sales and continuity of interest determinations, this court relies more heavily on the Seventh Circuit decision in *McDonald's* for guidance to determine whether the step transaction doctrine requires plaintiff to show evidence in addition to post-merger sales to disrupt continuity of interest. As discussed in this opinion, the step transaction doctrine, as defined in *McDonald's*, requires more than post-merger sales to disrupt continuity of interest.

 The end result test, generally, requires the court to look to the intent of the parties. *True v. United States*, 190 F.3d at 1175 (citing *Brown v. United States*, 782 F.2d at 563). As applied to post-merger sales and their effect on continuity of interest, the end result test requires the court to determine whether the steps were taken with the intent to cash out the target stockholders. *See McDonald's Restaurants of Ill., Inc. v. Commissioner*, 688 F.2d at 524. This court must take into consideration the totality of the circumstances. *See id.* (taking into account "the history of the parties' relationships, the abortive attempt to buy some of the group's holdings, the final comprehensive deal, and the [investment] group's determination to sell out even in the face of falling prices in the stock . . . ."). The end result test, therefore, requires the court to look beyond post-merger sales to determine whether continuity of interest was disrupted.

 The interdependence test, as described in *McDonald's*, also requires the court to look beyond post-merger sales. In determining whether the merger would have taken place without the guarantees of salability, the court must look to the terms of the agreement and the parties' positions in the negotiations. *McDonald's Restaurants of Ill., Inc. v. Commissioner*, 688 F.2d at 524–25. The requirement acts to maintain the objective nature of the interdependence test by comparing the separate events in question with those which might occur in normal business settings. *See id.; see also True v. United States*, 190 F.3d at 1176. The interdependence test, like the end result test, thus, requires the court to look at evidence other than the post-merger sales to determine whether continuity of interest was disrupted.

Finally, the application of the step transaction doctrine to the continuity of interest requirement, as described in *McDonald's*, is consistent with the approaches used to analyze whether post-merger sales violate continuity of interest in an earlier Tax Court case and an earlier IRS Revenue Ruling. *See Heintz v. Commissioner*, 25 T.C. 132, 1955 WL 474 (1955); Rev. Rul. 66–23, 1966–1 C.B. 67, 1966 WL 15153. Rather than applying the step transaction doctrine, *Heintz* looked to what is now codified at section 354(a)(1) of the Code [10] and focused on whether the post-merger sales demonstrated that there was no "plan of reorganization." *Id.* at 133. An analysis of *Heintz* shows that, by focusing on the plan of reorganization, the Tax Court conducted a similar analysis to the one conducted under the end result and interdependence tests and found that a plan of reorganization requires consideration of both the intent of the parties and the relationship between the separate steps of the transaction. In *Heintz*, the sole shareholders of Jack & Heintz, Inc. wished to sell their shares in the company for cash. *Id.* at 134. Because they were unable to find a cash buyer, the shareholders accepted an offer from a purchasing group of $5,500,000.00 in cash and $2,500,000.00 in preferred stock in a holding company to be formed for acquiring Jack & Heintz. *Id.* at 134–35. The shareholders of Jack & Heintz accepted the offer on the condition that the stock they would receive in the merger would be the same as

---

10. "No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the organization." I.R.C. § 354(a)(1) (1994).

additional preferred stock offered to the public at a later date and that the stock they would receive would be sold at the same time as the public shares. *Id.* at 135. The Jack & Heintz shareholders viewed the stock they would receive as a deferred payment. *Id.* Contrary to this intent, the shareholders agreed to take steps necessary to qualify the merger as a reorganization. *Id.* For example, at the closing, the shareholders gave written representations that the stock they received in the merger was for investment purposes and not for distribution. *Id.* at 138. In addition, the draft merger documents described the merger as a reorganization. *Id.* at 135. Due to problems encountered with underwriters and a deteriorating market for the stock, the shareholders were not able to sell the shares they received in the merger within the time intended. *Id.* at 139. Subsequently, the purchasing group arranged for a private sale of the shareholders' stock. *Id.*

The Tax Court in *Heintz* found that the transaction was a sale and not a merger. *Id.* at 141–42. The court found that "[t]he essential element which must be shown if this transaction is to be termed a statutory reorganization is that the exchange took place 'pursuant to a plan of reorganization.'" *Id.* at 143. The court cited a number of factors which supported its decision that the transaction was a cash purchase:

> The terms of the instant plan did not contemplate the petitioners' maintenance of a proprietary interest in the continuing corporation. The record convinces us that petitioners wished to dispose of their entire interest in Jack & Heintz, Inc. When they were unable to obtain 'an all cash deal,' they settled for cash plus preferred stock in the purchasing corporation, but only after obtaining the promise of the promoters of such purchasing corporation that their preferred stock in that corporation would be sold together with a public offering of that corporation's stock within 30 days. Due to various unforeseen difficulties, the public offerings were delayed and, when finally made, the underwriters prevented the sales of petitioners' stock at that time. However, within a month, private sales were arranged by the purchasing group on petitioner's [sic] behalf and

petitioners disposed of all but the 10,000 shares then held in escrow. This was no mere readjustment of corporate structure. The old proprietors were stepping out; they were being paid in cash plus the preferred stock of the purchasing corporation; and most important, the preferred stock which they received was to be held only temporarily until its sale was arranged for by the purchasing group.

*Id.* at 142–43.

The approach in the *Heintz* case is similar to an analysis under the end result test because it focused on the "principal objective of the parties[,]" namely "the purchase and sale of Jack & Heintz, Inc." *Id.* at 143. The *Heintz* court came to this conclusion based on a number of factors, such as the initial attempt to complete a cash sale and the private sale set up by the purchasing group, which convinced the court that the essential nature of the transaction was a cash sale. *Id.* The *McDonald's* court analyzed a number of similar factors, to conclude that the shareholders wished to cash out. *McDonald's Restaurants of Ill., Inc. v. Commissioner,* 688 F.2d at 524. The *Heintz* opinion mirrors the *McDonald's* opinion's application of the interdependence test because *Heintz* focuses on the characteristics of the merger in relation to the post-merger sales. For example, the *Heintz* court cited how the terms of the merger agreement contemplated the post-merger sales. 25 T.C. at 142. Moreover, the guarantees that the stock could be sold shortly after the transaction were essential to the agreement. *Id.* at 141. The *Heintz* court appeared convinced that the sales would not have occurred without the guarantees of "saleability," the same consideration relied on in the *McDonald's* case. *See id.; McDonald's Restaurants of Ill., Inc. v. Commissioner,* 688 F.2d at 524–25.

Revenue Ruling 66–23 addressed whether the continuity of interest requirement was satisfied when:

> [U]nder a plan of reorganization, a shareholder of the transferor corporation received stock in the transferee corporation subject to a court order to dispose of all of the stock received within 7 years ... if the

shareholder at the time of the reorganization has no preconceived plan or arrangement for disposing of the stock received. 1966–1 C.B. at 67. Revenue Ruling 66–23 is brief and does not explain the standard on which the ruling is based. *Id.* Moreover, the facts of the transaction are only briefly outlined. *Id.* The ruling, however, did take into account a number of facts that were present in concluding that continuity of interest was not disrupted. The revenue ruling considered the fact that the shareholder at issue had no intent to sell its shares at the time of the merger, that the shareholder had complete discretion as to whether it would retain or dispose of the shares it received in the merger for a period of seven years and that the shareholder would possess all the benefits and would be subject to all the risks of ownership of the stock for those seven years. *Id.* Thus, similar to the analysis performed by the Tax Court in *Heintz* the analysis undertaken by the IRS in Revenue Ruling 66–23 looked to the totality of the circumstances to determine whether continuity of interest was disrupted and therefore mirrored the end result test as applied by the court in *McDonald's Restaurants of Illinois, Inc. v. Commissioner,* 688 F.2d at 524.

As the preceding discussion has demonstrated, the step transaction doctrine is a useful tool for determining when a series of formally distinct steps are, in substance, one integrated transaction. The step transaction doctrine applies to the analysis of post-merger sales in a continuity of interest determination because such sales can show that the stock used as consideration in the merger was merely a manner of effecting a deferred payment. Applying the end result and/or interdependence tests to determine whether post-merger shares disrupt continuity of interest, as laid out in *McDonald's,* requires the court to look to evidence outside of the sales themselves. The application of the step transaction doctrine to transactions involving post-merger sales conforms with prior case law, which took into account the parties intended end result and the relationship between the different steps, and with the spirit of the continuity of interest requirement, to smoke out the substance of the transaction.

Defendant has submitted a cross-motion for summary judgment arguing that the facts of this case demonstrate that the RSC shareholders did not intend to sell the NovaCare stock they received in the merger following the transaction and that, therefore, neither the interdependence test nor the end result test is satisfied in this case. Defendant relies on the statements signed by RSC Investors at the time of the reorganization setting forth that they had no plan or intention to dispose of more than twenty-five percent of the stock, the merger agreement describing the transaction as a reorganization and affidavits from representatives of five of the RSC Investors and two members of an investment banking firm involved in the merger supporting the statements signed at the time of the merger indicating no intention to sell. In further support, defendant provides a list of self-described, indirect evidence. Plaintiff, however, argues that there are unresolved facts involved in the step-transaction analysis which are material and at issue.

■ After careful consideration, the court denies defendant's cross-motion for summary judgment because the court disagrees with the defendant's reliance on the *Penrod* case and the existence of material facts in dispute. First, defendant's motion incorrectly interprets the step transaction doctrine with regard to the application of the end result and interdependence tests by arguing that "the only way plaintiff can prevail in this case is to establish that, at the time of the Merger, a sufficient number of RSC stockholders intended to sell their shares after the Merger." Defendant errs in that it incorrectly narrows the scope of the inquiry to the intent of the RSC stockholders. As discussed above, it is whether it was the intent of the parties to effect a cash purchase as the end result of their transaction, not merely the intent of the target shareholders to sell the stock received in the merger, which is the focus of the end result test. In addition, defendant mistakenly asserts that intent resolves the issue for both the end result and the interdependence tests. The interdependence test is different from the end result test. A finding of fact that the parties intended a reorganization as the end result of their transaction would

suffice only to prevent the application of the step transaction doctrine under the end result test. The step transaction doctrine could still be triggered, and plaintiff could still prevail, by establishing that the guarantees of salability were integral to the transaction and that the subsequent post-merger sales were a direct result of those guarantees. If that was the situation, under the case law, the court would make a finding that a cash purchase had occurred.

■ Moreover, in the instant case, even if the intent of the parties at the time of the transaction was the court's sole inquiry, the intent of the parties at the time of the merger is a material issue in this case. Given the record before the court, the factual determination of the parties' intent at the time of the merger is in dispute. Focusing on the material issues in dispute, it is useful to reiterate some of the pertinent rules governing summary judgment motions which apply to the issue at hand. Initially, the court notes that the impact of granting a motion for summary judgment is "drastic." *Rand v. Rowland,* 154 F.3d 952, 957 (9th Cir.1998), *cert. denied* 527 U.S. 1035, 119 S.Ct. 2392, 144 L.Ed.2d 793 (1999). Such a motion is more than a technical procedure, it adjudicates the substantive rights of the parties. *See id.* (citing *Hoffman v. Babbitt Bros. Trading Co.,* 203 F.2d 636, 637 n. 1 (9th Cir.1953)); 10A Charles Alan Wright & Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2712 at 212 (3d ed.1998). Denying a motion for summary judgment "does not settle or even tentatively decide anything about the merits of the claim. It is strictly a pretrial order that decides only one thing— that the case should go to trial." *Switzerland, Cheese Ass'n v. E. Horne's Market, Inc.,* 385 U.S. 23, 25, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966); *accord Lermer Germany GmbH v. Lermer Corp.,* 94 F.3d 1575, 1576 (Fed.Cir. 1996), *cert. denied* 519 U.S. 1059, 117 S.Ct. 691, 136 L.Ed.2d 614 (1997).

A motion for summary judgment will not succeed if there is a *"genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original). "As to materiality ... [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505. A genuine issue arises when a finder of fact could return a verdict for the nonmoving party. *Id.* In this regard, "'all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Id.* at 249, 106 S.Ct. 2505 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569, *reh'g denied* 393 U.S. 901, 89 S.Ct. 63 (1968)). There is no issue for trial, however, unless there is evidence supporting the nonmoving party sufficient for the judge to return a verdict in its favor. *Id.*

"As a general rule, the factual question of intent is particularly unsuited to disposition on summary judgment." *Copelands' Enters., Inc. v. CNV, Inc.,* 945 F.2d 1563, 1567 (Fed. Cir.1991) (citing *KangaROOS U.S.A., Inc. v. Caldor, Inc.,* 778 F.2d 1571, 1575 (Fed.Cir. 1985) (citing *Pfizer, Inc. v. Int'l Rectifier Corp.,* 538 F.2d 180, 185 (8th Cir.1976), *cert. denied* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977)) and *Albert v. Kevex Corp.,* 729 F.2d 757, 763 (Fed.Cir.), *reh'g denied* 741 F.2d 396 (Fed.Cir.1984)). "Intent is a factual matter which is rarely free from dispute ...." *Albert v. Kevex Corp.,* 729 F.2d at 763. Determinations requiring the court to ascertain the subjective state of mind of the parties depend upon the credit given to witnesses by those who see and hear them. *United States v. Yellow Cab Co.,* 338 U.S. 338, 340–41, 70 S.Ct. 177, 94 L.Ed. 150 (1949); *see also Crawford–El v. Britton,* 523 U.S. 574, 599–600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

As direct evidence of intent, defendant points to individual, signed declarations by the RSC Investors, made at the time of the merger, indicating that each investor had no intent to sell or dispose of more than twenty-five percent of the shares they received in the merger. Defendant also has submitted affidavits from a number of RSC stockholders discussing their intent, at the time of the merger, to hold onto the NovaCare stock they received in the transaction. Finally,

defendant notes that according to the Merger Agreement between RSC and NovaCare, the parties intended to form a reorganization and, thereby, fulfill the continuity of interest requirement.

Defendant also presents indirect evidence of intent. First, defendant, supported by the affidavits of the RSC stockholders and an admission by the plaintiff, notes that the RSC stockholders never requested that the merger between RSC and NovaCare be completed with cash instead of NovaCare stock. In addition, defendant argues, and plaintiff has admitted, that the RSC stockholders who sold their shares in the month and a half after the end of the pooling period did so at the height of NovaCare's value. Defendant claims that the RSC stockholders sold their shares to take advantage of a high stock price, not because of a preconceived intent to sell. Next, defendant notes that the plaintiff's attorneys provided a written opinion that the merger between RSC and NovaCare would be considered a tax-free reorganization. Defendant also alleges and plaintiff admits that the RSC Founders were retained by NovaCare as employees after the merger.

Finally, defendant argues that there were additional economic reasons, individual to each shareholder, as to why the RSC stockholders sold their shares received in the merger. For example, defendant has presented a declaration from Charles R. Walker, an employee of Allstate Insurance Company, one of the institutional investors in RSC. Mr. Walker made investment decisions and monitored certain venture capital investments for Allstate. According to Mr. Walker, Allstate sold the shares it received in the merger on October 18, 1991 because, after the merger was complete, Allstate's then parent company, Sears, Roebuck and Co., requested Allstate to identify any investment which could be sold for a gain. Defendant also presents a declaration from Frederick C. Powell, the former president and CEO of RSC, stating that he sold his NovaCare shares to fund the building of a new house. In addition, two other RSC Founders, Paul Kruis and Thomas Paese, stated in declarations that they sold their shares in NovaCare because they were advised to do so because over ninety percent of their net worth was in one stock, NovaCare.

In response, although NovaCare has not presented any direct evidence on the issue of intent, it has gathered sufficient circumstantial evidence to demonstrate a dispute regarding the intent of the RSC shareholders at the time of the merger. First, plaintiff presents evidence showing that the bulk of RSC stockholders were professional investors interested in turning over capital. Plaintiff presents selections from the deposition testimony of John Foster, the Chairman of the Board of NovaCare, which states that the RSC stockholders, as venture capitalists, were looking for a method to cash out their investment when NovaCare proposed the merger. According to the declarations of a number of RSC stockholders (Powell, Kruis and Smith) presented by the defendant and cited by the plaintiff, prior to the merger, the RSC stockholders were exploring a possible merger with several companies. According to the declarations of those RSC stockholders, RSC was unable to find a merger partner and began the process of preparing an initial public offering whereby the RSC stockholders could have sold their shares. According to plaintiff, RSC's attempt to find a merger partner and proceed with an initial public offering evidenced an attempt to "shop" RSC for sale in order to turn over capital and create liquidity for the RSC stockholders.

According to the Notification of Merger issued in relation to the merger between RSC and NovaCare, the RSC Board opted for the merger in part because the valuation of RSC in the merger was "significantly in excess of the IPO valuation." Moreover, the Notice of Merger between RSC and NovaCare lists the liquidity of the NovaCare stock as another of three factors "weighted most heavily by the Rehab [RSC] Board in support of the Merger." The RSC Investors' interest in the liquidity of the NovaCare stock demonstrates that the RSC Investors were concerned about ensuring the ability to sell their stock, a concern which demonstrates no loyalty to the concept of reorganization and raises the issue of the RSC stockholder's intent to sell even immediately after the merger.

In addition, according to selections from John Foster's deposition testimony, as well as from the deposition testimony of Nova-Care's Chief Financial Officer, Timothy E. Foster, the market for NovaCare stock was a critical concern during the merger negotiations, as NovaCare was worried that the RSC stockholders would quickly dispose of their stock and cause a dip in the price. According to Timothy E. Foster's deposition testimony, because the RSC Investors were "overwhelmingly venture capitalists," Nova-Care was concerned that the NovaCare stock would become "volatile and problematic." Consequently, NovaCare requested that the RSC Investors not sell or distribute more than twenty-five percent of that stock in each of the four quarters after the pooling period ended. NovaCare's attempt to create a structure to slow the RSC Investor's sale of the stock received in the merger can be interpreted to demonstrate that at the time of the merger, NovaCare feared that a significant amount of the RSC Investors would attempt to sell their shares in NovaCare following the close of the pooling period.

Finally, the post-merger sales are also probative of the parties' intent given their scope and timing. Thirty-three percent of the shares received by RSC stockholders in the merger were sold the day after the close of the pooling period. A little more than a year after the merger, roughly eighty-seven percent of the shares received in the merger by RSC stockholders had been transferred. Although defendant attempts to argue that the motivation for the sales occurred after the merger, plaintiff has raised sufficient arguments to rebut the defendant's contentions for the purposes of a motion for summary judgment. First, plaintiff attacks the defendant's position that the post-merger sales were motivated by an escalation in the price of the NovaCare stock, which occurred after the merger. Plaintiff asserts that the RSC stockholders were aware of appreciation of NovaCare's stock prior to the merger. According to the Notice of Merger issued by the parties with regard to the merger between RSC and NovaCare, Nova-Care's stock rose consistently in the fiscal year ending June, 30, 1998 until the merger. Moreover, according to the declarations of

two of the RSC stockholders presented by the defendant, prior to the merger, the RSC stockholders anticipated the future growth of NovaCare stock. Plaintiff also attacks the defendant's position that some of the RSC stockholders sold the shares they received in the merger to diversify their portfolios. According to the defendant, Mr. Kruis and Mr. Paese sold their shares because they were concerned that ninety percent of their net worth was in one stock, NovaCare. Plaintiff notes that RSC's merger with NovaCare "did not represent a change of circumstances after the Merger, since their net worth had been similarly concentrated in RSC stock before the Merger."

As discussed above, defendant's cross-motion for summary judgment incorrectly interprets the applicable law by limiting the scope of the end result test by focusing solely on whether the RSC stockholders intended to sell the shares they received in the merger rather than the parties' intent to effect a cash purchase as the end result of their transaction. Defendant's motion also misapplies the applicable law in that it states that the intent of the parties resolves both the end result and interdependence tests, rather than recognizing the differences between the tests and the fact that plaintiff need only satisfy one of the two tests to apply the step transaction doctrine. Finally, even if the court were to adopt the defendant's interpretation of the law, in light of the factual questions raised by the plaintiff regarding the intent of the parties, the court concludes that this case is not ripe for summary judgment at this time and that resolution of the issues of intent discussed above are better preserved for resolution at trial.

## CONCLUSION

Pursuant to the above discussion, the court DENIES both plaintiff's motion for partial summary judgment and defendant's cross-motion for summary judgment.

**IT IS SO ORDERED.**